**Kenneth L. and Catherine S. MULHOLLAND, et al.,[1] Plaintiffs**

v.

**The UNITED STATES, Defendant.**

**No. 645–85T and consolidated cases.**

United States Court of Federal Claims.

May 3, 1993.

February 13, 1991 and December 19, 1991, a time period in which petitioners could have refiled.

1. The reader should observe that the opinion in the *captioned case* is controlling and dispositive, by stipulation, of sixty-seven (67) related cases that have been consolidated. For purposes of clarity, therefore, this opinion consists of two parts, *i.e.,* the subject controlling case (Part A), and the related cases (Part B). The precise identification of all sixty-seven (67) related taxpayers is detailed in Part B, *infra.*

Richard M. Squire, Philadelphia, PA, attorney of record, for plaintiffs.

William K. Drew, Washington, DC, with whom was Acting Asst. Atty. Gen. Michael L. Paup, for defendant.

## OPINION

REGINALD W. GIBSON, Judge:

*Part A:*

Plaintiffs, Kenneth and Catherine Mulholland (taxpayers herein), filed the instant suit in this court[2] on October 30, 1985, seeking a refund of federal income taxes assessed by the Commissioner of Internal Revenue (Commissioner) against their joint income tax returns for the taxable years of 1981 and 1982. This income tax refund suit stems from the Commissioner's determination that the method of accounting for deductible interest expenses utilized by Quincy Associates, Limited (Quincy), a partnership in which Mr. Mulholland was a limited partner during the subject taxable years, did not "clearly reflect income" as required by § 446(b) of the Internal Revenue Code (I.R.C.). That is, the Commissioner determined that Quincy's claimed interest expenses, as *allocated* pursuant to the Rule of 78's, constituted nondeductible expenses in the years in issue to the extent that said interest expenses exceeded the amount allowable each year under the economic accrual method. It is that latter method of accounting[3] which the Commissioner deems to be "clearly reflective" of Quincy's income. For the reasons hereinafter expressed, the court finds, following a trial on the merits, as to Count I, that (i) Quincy's income for the taxable years of 1981 and 1982 was not "clearly reflected" as required by I.R.C. § 446(b), ergo, the plaintiffs' income, as a limited partner, is also not "clearly reflected" for those years; and (ii) the Commissioner, therefore, did not abuse his discretion in changing Quincy's accounting method from the Rule of 78's to the economic accrual method; and, as to Count III, that Quincy is not entitled to utilize the benefits of Revenue Procedure 84–28[4] in changing its method of accounting to the economic accrual method from the Rule of 78's method.

---

2. Pursuant to the Federal Courts Administration Act of 1992, Pub.L. No. 102–572, 106 Stat. 4506 (1992), the name—"United States Claims Court"—was changed to—"United States Court of Federal Claims."

3. The economic accrual method is set forth in Revenue Ruling 83–84, 1983–1 C.B. 97 (hereinafter Rev.Rul. 83–84). Therein, it is defined as the "true cost" of indebtedness for a given period. More specifically, the true cost of indebtedness is the "effective rate of interest, which is a uniform rate over the term of the loan and is based on the amount of the loan and the repayment schedule provided in the loan agreement, when applied to the unpaid balance of the indebtedness for a given period. . . ."

4. Rev.Proc. 84–28 was promulgated by the Commissioner to "provide a mandatory procedure for taxpayers to change their method of accounting for interest on indebtedness when they have been reporting interest income or deductions in accordance with the Rule of 78's [method]." The procedure, generally, prohibits its benefits from being realized "by a *lender or*

Jurisdiction is premised on § 6532(a)[5] and § 7422(a)[6] of the Internal Revenue Code of 1954, 26 U.S.C. §§ 6532(a) and 7422(a), and the Tucker Act, 28 U.S.C. § 1491.[7]

## PROCEDURAL HISTORY

The filed complaint averred three counts as follows: (i) "the Commissioner erroneously determined that Quincy was not entitled to deduct interest expenses, allocated pursuant to the Rule of 78's[8] method of accounting, to the extent that such method resulted in claimed interest expense in excess of the amount accruable under the *rationale* of Revenue Ruling 83–84, 1983–1 Cum.Bull. 97 (hereafter Rev.Rul. 83–84)," *Mulholland,* 16 Cl.Ct. at 253; (ii) "the Commissioner abused his discretion under 26 U.S.C. § 7805(b) ... (a) in failing to apply the *rationale* of Rev.Rul. 83–84 on a prospective only basis; and (b) in exempting short-term consumer loans from its mandates," *Id.;* and alternatively (iii) "the Commissioner erred in refusing to allow Quincy to utilize the procedures outlined in Revenue Procedure 84–28, 1984 Cum.Bull. 475 (hereafter Rev.Proc. 84–28)." *Id.* Counts II and III were previously before this court for decision on cross-motions for summary judgment, and an order pertaining to said motions was issued on January 30, 1989. *Mulholland v. United States,* 16 Cl.Ct. 252 (1989). With respect to Count II, the court granted defendant's motion for summary judgment, and as to Count III the court denied defendant's motion for summary judgment. Thereafter, on January 30, 1990, and without leave of court, defendant filed a second motion for summary judgment, this time including Count I for the first time, and Count III for the *second* time. On April 20, 1992, the court issued an opinion denying said motion on both counts. *Mulholland v. United States,* 25 Cl.Ct. 748 (1992).

## FACTS

Plaintiffs herein are residents of the State of Delaware, and filed their joint income tax returns on a calendar-year ba-

---

borrower ... if an issue concerning the amount of reported interest income or claimed interest deduction has been *raised and is pending* on April 2, 1984, in connection with the examination of *the taxpayer's* federal income tax return." *Mulholland,* 16 Cl.Ct. at 266 (emphasis added).

5. 26 U.S.C. § 6532(a) provides in pertinent part as follows: "Suits by taxpayers for refund.—(1) General Rule.—No suit or proceeding under 7422(a) for the recovery of any internal revenue tax, penalty, or other sum, shall be begun before the expiration of 6 months from the date of filing the claim required under such section unless the Secretary or his delegate renders a decision thereon within that time, nor after the expiration of 2 years from the date of mailing by certified mail by the Secretary or his delegate to the taxpayer of a notice of the disallowance of the part of the claim to which the suit or proceeding relates."

6. 26 U.S.C. § 7422(a) provides in pertinent part: "No suit prior to filing claim for refund.—No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the

Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof."

7. 28 U.S.C. § 1491(a) (1988) states in part:

(1) The United States [Court of Federal Claims] shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department....

8. "The Rule of 78's method [often referred to as the sum-of-the-digits method] is a mechanical *formula* for allocating interest to time periods during the life of a loan." *The Rule of 78's in Light of Revenue Ruling 83–84,* Taxes, April 1985, at 312. Under the Rule of 78's method of allocation, the total amount of interest to be allocated during the life of the loan is multiplied by a fraction, *i.e.,* the number of remaining months to maturity (the numerator) divided by the sum of the number of months in the original term (the· denominator). Gertzman, *Federal Tax Accounting* ¶ 3.03[3][a], 3–26 n. 85. When the Rule of 78's method is used to allocate the interest expense deduction, in each succeeding year this reducing fraction is applied to the total interest due, and the product thereof is expensed as interest for the taxable year. *Id.* For a more detailed explanation of the Rule of 78's method, *see Mulholland,* 16 Cl.Ct. at 253 n. 2.

sis.[9] On April 13, 1982, and April 10, 1983, the taxpayers filed their 1981 and 1982 tax returns, respectively. Within three years after filing their 1981 tax return, *i.e.*, on or about March 25, 1985, the Commissioner assessed additional taxes of $1,781.00, and interest in the amount of $881.21, against the taxpayers for the taxable year 1981. A short time thereafter, on or about April 8, 1985, the Commissioner assessed additional taxes of $1,366.00, and interest in the amount of $351.20, against the taxpayers for the taxable year 1982. On April 9, 1985, and April 19, 1985, the taxpayers paid in full the additional tax and interest assessments for both years, 1981 and 1982, respectively. Shortly thereafter, on June 14, 1985, taxpayers filed a timely claim for refund of said assessments. The Commissioner, in turn, denied the taxpayers' refund claims for both 1981 and 1982 on October 17, 1985, and, thereafter, they filed the instant suit in this court on October 30, 1985, to recover the payments of additional tax and interest assessments as to both taxable years 1981 and 1982.

On November 14, 1980, Mr. Mulholland purchased a share in Quincy Associates, Limited, a partnership using the accrual method of accounting and the calendar year for income tax reporting purposes. He paid a total of $28,750.00 for his interest—$1,150.00 was paid in cash to FDI Financial Corporation (FDI), and the balance was paid in the form of a promissory note in favor of Quincy. During both 1981 and 1982, Mr. Mulholland remained a limited partner in Quincy and took his distributive share of partnership deductions as evidenced in his tax returns. In making his decision to buy into the Quincy partnership, Mr. Mulholland relied on various documents, *infra*, providing written information about the Quincy venture in addition to its overall federal tax consequences. One such document was Quincy's Private Placement Memorandum. Said document describes the Quincy transaction[10] as an investment vehicle for its prospective limited partners, and contains matters including, but not limited to, financial projections for said investors to base their investment decision.[11] Another relevant document at that time was a proposed Tax Opinion that was prepared for Quincy by retained counsel. The issue therein which raised the main tax risk discussed in the Private Placement Memorandum was, *inter alia*, whether there was a high probability that the IRS may not allow the full interest deductions claimed each year pursuant to the Rule of

9. Note that most of the basic material facts, relative to the obligation, in the case at bar are substantially identical to those contained in the Tax Court Opinion in *Prabel v. Commissioner of Internal Revenue,* 91 T.C. 1101 (1988), *aff'd,* 882 F.2d 820 (3d Cir.1989). This is so because the taxpayers therein were investors (limited partners) in the Quincy Associates partnership as were plaintiffs herein. *Compare Prabel,* 882 F.2d at 821, with *Mulholland,* 16 Cl.Ct. at 256. In addition to the foregoing, it is also important to observe that the *Prabel* court disposed of the merits by summary judgment in favor of the defendant. *Prabel,* 91 T.C. at 1120. The court there held that "[n]o genuine issue exists as to any material fact and respondent [the government] is entitled to summary judgment on this issue as a matter of law." *Id.* Conversely, this court twice denied defendant's motions for summary judgment. *See Mulholland,* 16 Cl.Ct. 252, and 25 Cl.Ct. 748.

10. The Quincy transaction was a private offering to individuals to invest in a venture as limited partners. The syndication group which established Quincy also structured and created other partnership ventures. Generally, each partner's proportionate partnership interest is relatively small; therefore, any tax issue relating to the partnership attributes the same proportionate tax consequence to each limited partner. In all of these partnership ventures, there are hundreds of limited partners, and, where the utilization of the Rule of 78's is the issue, each partner's proportion is relatively small. However, collectively, and in the aggregate, the timing differences of the deduction(s) of the entire group of partners generates a substantial accelerated tax consequence in the years in issue.

11. Quincy Associates, Ltd. is a Florida limited partnership which was formed in August of 1980. Specifically, it is a real estate syndication limited partnership which owns a single asset, *i.e.,* the Quincy Plaza shopping center in Quincy, Florida, which is anchored by Winn–Dixie and formerly by TG & Y. In laymen's terms, a real estate syndication is a form of investment arrangement whereby a group of individuals, generally limited partners, enter into a partnership to acquire a specific asset, *i.e.,* some type of real estate, and to share in the economic benefits of owning said asset.

78's, inasmuch as there was no recognized authority for the utilization of that allocating methodology. Notwithstanding the aforementioned *admitted* risk, among others, many taxpayers, in particular Mr. Mulholland, invested in the Quincy partnership.

Thus, in the latter part of 1980, Quincy Associates, Ltd. (Quincy), acquired the Quincy Plaza shopping center (the project) in Quincy, Florida.[12] Quincy purchased the project from FDEC, an affiliate of Quincy's General Partners,[13] for a total cost of $2,471,000. This amount was payable in cash of $192,000 at closing, and the remainder in the form of a nonrecourse purchase money wraparound[14] note (the Note), secured by a purchase money wraparound mortgage (the Mortgage),[15] in the gross amount of $7,268,249. This latter gross amount consists of $2,279,000 ($2,471,000—$192,000) which represents the principal amount of the Note and $4,989,249 which represents the interest portion of the Note. However, no explicit interest rate is stated in the Note. Said Note is due on December 31, 2003, approximately 23 years and two months from the date it was made. The terms of the Note permit Quincy to prepay; however, if such an event occurs, Quincy is obligated by the terms of the Note to pay all interest that has accrued on the Note as of that date pursuant to the Rule of 78's. According to the record, Quincy made no prepayments of the Note during 1981 or 1982. Instead, it reported and deducted on its partnership return accrued interest expenses for 1981 and 1982 of $417,604 and $399,078, respectively. Said amounts were allocated pursuant to the Rule of 78's method of accounting, and exceeded the amount of payment made by Quincy on the Note for those two years.[16] Plaintiffs, of course, deducted their distributive share of Quincy's claimed interest expenses in the amounts of $7,827 for 1981 and $7,480 for 1982.

The sponsors that structured the Quincy transaction were FDI[17] and its affiliates, Barley Mill Management Corporation, FDEC, and FDI Investment Corporation. The independent broker/dealer which sold the limited partnership interests in Quincy was FFMC Securities, Inc. (FFMC), repre-

12. Prior to Quincy's purchase of the shopping center from First Delaware Equity Corporation (FDEC), Mr. Ward Hunt previously acquired the property on January 25, 1979, for a price of $2,313,473, which included a cash payment of $437,434 and an assumption of the First Mortgage on the property of the prior owner, Quincy Plaza, Ltd., in the amount of $1,876,039. Mr. Hunt thereafter sold the property to FDEC on August 20, 1980, for $2,470,937.10, which included a cash down payment of $107,000; a payment of $100,800 due one month after closing; a short term note in the amount of $418,200 (FDEC Purchase Money Note); and the remainder payable in the form of an assumption of the First Mortgage with a then outstanding principal balance of $1,836,937.

13. The general partners in Quincy in 1980 consisted of a corporate managing partner, Barley Mill Management Corporation, and four individuals, F. Lamar Watson, Robert V. Holton, Edmond S. Pendleton, and Bruce Moore. Note that the aforementioned four individuals owned substantial interests in the Barley Mill Management Corporation, as well as in FDEC, the seller/mortgagee in the Quincy Plaza transaction. None of the general partners of Quincy, however, are in any way related to the limited partners of Quincy.

14. The term "wraparound" in this context means that the Note to FDEC by Quincy, in effect, wraps around the two preceding debts on the property which FDEC is obliged to pay, that is, the FDEC Purchase Money Note to Mr. Ward Hunt and the First Mortgage which it assumed upon purchase of the property. Thus, the wraparound Note is subordinate to the other two notes which are prior in time.

15. In addition to this Note, Quincy obtained a short-term loan in the amount of $875,000 from First Pennsylvania Bank. This short-term loan was needed to provide cash to the partnership during the limited partners' pay-in-period. The interest rate on the First Pennsylvania loan was 1½ percent above prime, and in order for Quincy to obtain this loan, FDEC had to assign the Note and Mortgage as collateral. Thus, the loan from First Pennsylvania Bank was a prior lien on the Quincy Plaza shopping center, than that of the Note and Mortgage between FDEC and Quincy.

16. The record shows that Quincy did not seek a ruling from the Internal Revenue Service (IRS) regarding its use of the Rule of 78's method for deducting interest expenses prior to filing its partnership tax return.

17. At the time of the Quincy transaction, FDI was in the business of originating investment assets to be marketed to clients with sufficient quality and financial wherewithal.

sented by Mr. Gerald Flannely.[18] In structuring the Quincy transaction, the sponsors utilized the Rule of 78's, *allegedly*, because they felt that at the time of the Quincy Plaza transaction, the Rule of 78's method of allocating interest deductions best reflected (i) the then existing market interest rates for comparable loans with subordinate financing; (ii) the lender's declining risk over the stated term of the loan;[19] and (iii) the fact that the Rule of 78's method was relatively easy to implement.[20] In addition, plaintiffs aver that, in utilizing the Rule of 78's, they took into account inflation,[21] the predictability of income, interest rates,[22] taxes, the possibility of profit to the sponsors, and the possibility of a return on investment to the limited partners which would be competitive with other investment opportunities in the marketplace.[23]

Consistent with the foregoing, a representative of FDI, Ms. Denise Doyle, averred by her testimony that the interest rate on the Note in 1981, *under the Rule of 78's*, is 18%. Tr. 662. We find, as previously noted, that no such rate is stated in the Note, nor is there any indication anywhere in the terms of the Note of any such specific interest rate. Rather, it is more accurate to state that the amount of interest "accrued" on the Note in 1981, by the mere mechanical application of the Rule of 78's, is approximately equivalent to 18% of the principal balance of the Note for that year. In fact, when asked by counsel to describe how she determined that the interest rate on the Note for 1981 was 18%, Ms. Doyle indicated that she made a calculation of the rate by "dividing the total amount of interest by the principal amount of the mortgage." Tr. 662.

The Commissioner determined, on or about September 12, 1984, and pursuant to § 446(b) of the I.R.C., that Quincy's use of the Rule of 78's, in *allocating* its interest deductions over the life of the Note, did not clearly reflect income, as described in Rev. Rul. 83–84.[24] On this basis, the Commis-

---

**18.** There is no relationship between the broker/dealer FFMC and the sponsors of the Quincy transaction.

**19.** According to Quincy, it was necessary for the sponsors to use the Rule of 78's method of allocating deductions in order to compensate the lender, *i.e.*, FDEC, for the risks associated with the transaction by allowing FDEC to earn a profit, in terms of interest accruals during the earlier periods of the loan, when the associated risks of the transaction were at their highest point.

**20.** In addition to the foregoing, the sponsors chose to use the Rule of 78's *allegedly* because (i) the broker/dealer would not have permitted the investors to pay an interest rate in excess of market; (ii) the State Blue Sky Commissioners would not have approved an interest rate in excess of the market rate; and (iii) partnership counsel would not have issued their tax opinion if the interest rate exceeded the market.

**21.** During the early 1980's, when the sponsors structured the Quincy transaction, the inflation rate in the United States was high, *i.e.*, double digits.

**22.** Mr. Brian Strum, plaintiffs' expert in the commercial real estate industry and the structuring of real estate deals, testified that interest rates on commercial grade real estate in the late 1970's and early 1980's were "probably in the 18 to 20 percent range." Tr. 244–45.

**23.** Specifically, the risk factors *allegedly* assumed by FDEC in the Quincy transaction were as follows: (i) high inflation; (ii) a subordinated lien position; (iii) FDEC's obligation to pay the assumed First Mortgage and the FDEC Purchase Money note; (iv) the risk of default by the limited partners in paying in their respective subscription prices over a five-year period; (v) the fact that FDEC had to bear the cost of the Winn–Dixie expansion during the period that the limited partners were still paying in their subscription prices; (vi) the risk that Winn–Dixie could change its mind and decide not to expand, which would adversely affect the value of the Quincy Plaza shopping center; (vii) the risk that the local tenants might not continue to make timely payments; and (viii) the general economic and operating risks associated with all real estate transactions. Plaintiffs argue that as a result of all such risks, the sponsors had to structure an interest rate that afforded FDEC protection against these risks, particularly those inherent to a subordinated lending position.

**24.** Whether the taxpayer utilizes the Rule of 78's or the economic accrual method, the total dollar amount of the interest obligation over the full term of 23 years and two months, *i.e.*, $4,989,249, will not change. The threshold problem here is *not* the calculation of the gross interest over the full term, but rather how that amount is to be allocated over each annual period of the loan for income tax reporting purposes. While the government has not raised in any proceedings before *this* court, the issue of whether the Quincy–FDEC transaction is a sham (in fact, it

sioner required Quincy to change its method of accounting for interest expenses on the Note from the Rule of 78's to the economic accrual method, and disallowed that portion of the interest expense accrued and claimed by Quincy which exceeded the amount of interest accruable pursuant to the economic accrual method. The Commissioner notified Quincy of the required change and additional assessments of tax and interest for each year on or about January 29, 1985. The following table details (i) the amount of interest expense accrued and deducted by Quincy on its return (Form 1065) with respect to the Note for each year in issue; (ii) the amount of interest expense accruable under the economic accrual method as determined by the Commissioner; and (iii) the amount of interest expense disallowed by the Commissioner for the taxable years 1980, 1981, and 1982:

TABLE 1

| DESCRIPTION | 1980 | 1981 | 1982 |
|---|---|---|---|
| (1) Deducted by Quincy—Rule of 78's | $71,402 | $417,604 | $399,078 |
| (2) Allowed by Commissioner—Economic Accrual Method[25] | $43,964 | $249,847 | $233.415 |
| (3) Disallowed by Commissioner—[ (1)-(2) ] | $27,438 | $167,757 | $165,663 |

Based on the record evidence, the Note requires Quincy to make monthly payments to FDEC of principal and interest beginning in November of 1980, and continuing through December of 2003. The total annual payments that Quincy is required to make to FDEC (in equal monthly installments) for the entire period of the loan are as follows:

TABLE 2

| YEAR | TOTAL PAYMENT DUE ANNUALLY |
|---|---|
| 1980 | $ 133,000 |
| 1981 | 385,000 |
| 1982 | 379,000 |
| 1983 | 362,000 |
| 1984 – 2003 | 206,000 |
| TOTAL | $5,379,000 [26] |

states that it does not here contend) or that it lacks any significant economic substance, aside from its tax advantages, we observed that the Third Circuit in *Prabel v. Commissioner of Internal Revenue*, 882 F.2d 820, 822 (3rd Cir.1989), found that "[t]he terms ... were not the result of arms-length negotiations." It is, therefore, safe to conclude that, by the government's own tacit admission, the Quincy transaction does in fact have significant economic substance without regard to the efficacy of any tax benefits it may offer to its investors. In addition, the fact that the Note is a wraparound note does not alter the manner in which interest is computed or accrued.

25. The amounts with respect to the economic accrual method, which were determined to be allowable by the Commissioner, through his agent Mr. Hudak, were in fact calculated by Quincy, in that Ms. Doyle provided Mr. Hudak with the amortization schedules detailing the correct amount of interest deductions allowable under the economic accrual method for the Quincy wraparound Note. This occurred because the revenue agent did not have access to a computer, without which the calculations would have been extremely vexing to perform.

26. In addition to these payments, Quincy must make a balloon payment of $1,889,249 in 2003

The parties stipulated that Quincy made all such payments for the tax years at issue. For a complete schedule of (i) Quincy's interest accruals and deductions pursuant to the Rule of 78's; (ii) the portion of Quincy's payments treated as interest accruals under the Rule of 78's; (iii) interest deductions that would be allowable each year under a ratable or straight-line method; (iv) interest deductions allowable under the economic accrual method; and (v) the difference between the accrued interest expense deducted by Quincy under the Rule of 78's and that allowed by the Commissioner under the economic accrual method over the life of the loan, *see* Appendix A attached hereto.

With respect to the audit examination, the IRS contacted Quincy, on or about September 14, 1983, for the purpose of *scheduling* an examination of its federal income tax return. Said examination was based on the IRS's preliminary determination that Quincy, a partnership within the FDI group, was computing its interest deductions on long-term mortgage indebtedness under the Rule of 78's.[27] Just prior to commencing the audit, on September 13, 1983, Mr. Hudak requested from the comptroller for FDI, Ms. Mary Wassal,[28] a list of all FDI-sponsored partnerships that used

the Rule of 78's method of accounting; said list included Quincy.[29] It is important to note, however, that on initial contact Revenue Agent Hudak did not expressly inform Quincy as to the fact that he was auditing *Quincy's* partnership return because of its excessive interest deductions.[30] In fact, the form letter opening numerous partnership returns for audit merely listed Quincy as one of the "Partnerships with Rule of '78 Mortgages," and made no specific indication that Quincy's interest deductions were in question by the IRS; rather, the letter merely sought the standard documents generally requested in any IRS partnership audit.

In any event, in October of 1983, Mr. Hudak requested that Ms. Wassal provide him with copies of Quincy's partnership return, but she did not do so at that time. Rather, Ms. Wassal requested that Mr. Hudak suspend his examination of the partnerships until sometime after FDI's busy season ended on April 15, 1984, that is, until FDI could complete the closing of its year-end books and records and file its tax returns with the IRS. According to Ms. Wassal, Mr. Hudak agreed to suspend the audit, and did not contact FDI again until *after* April 15, 1984.[31] In any event, the

in order to equal the gross amount of the Note of $7,268,249.

27. According to DX 15, an IRS internal memorandum, Revenue Agent Michael Hudak, notified his group manager on July 26, 1983, that, based on information obtained from an audit of FDEC, it is likely that a group of partnerships, known as the FDI group, were taking interest expense deductions under the Rule of 78's and contrary to Rev.Rul. 83–84.

28. Ms. Wassal had the responsibility of handling the partnership audits on a day-to-day basis. Moreover, she was generally present at all of the meetings with Mr. Hudak, and had power-of-attorney, along with several other people with respect to the Quincy audit.

29. When Revenue Agent Hudak opened the partnership audits on September 14, 1983, he

indicated in his letter that he wished to audit those partnerships which were contained in the list Ms. Wassal had provided to him on the previous day, that is, the list attached to the audit letter was identical to the list Ms. Wassal had previously provided him.

30. In addition, Ms. Wassal testified that, based on her discussions with Mr. Hudak during the corporate audits of FDEC and FDI, she was under the impression that Mr. Hudak opened up the partnership audits, including that of Quincy, because FDEC was a cash-basis taxpayer which owned a wraparound mortgage, and the partnerships (obligors) were accrual-basis taxpayers.

31. At trial, Mr. Hudak testified that, during a meeting in October of 1983, he spoke with a Mr. Bill Giese about delaying the examination of the partnership returns. Tr. 1088–91. He could not recall if Ms. Wassal was at the meeting or

record shows that Mr. Hudak did not receive the documents that he previously requested until sometime after May 24, 1984, the date on which he issued a *second* formal written request letter, asking for amortization schedules for the economic accrual method, the Rule of 78's method, payment schedules, partnership agreements, and loan documents.[32] Tr. 1103–05. After conducting the audit, Revenue Agent Hudak prepared his Revenue Agent Report (RAR), changing Quincy's method of allocating its interest expense deductions from the Rule of 78's to the economic accrual method for the taxable years 1981 and 1982. By this process, he disallowed those interest deductions taken under the Rule of 78's which exceeded the amounts otherwise allowable under the economic accrual method, thereby requiring Quincy to make a positive § 481 adjustment on its tax return for the appropriate year(s). Finally, to date, Quincy has failed to file Form 3115, entitled "Application for Change in Method of Accounting," with the IRS as required by Rev.Proc. 84–28, seeking a change in its method of allocating interest expense deductions, from the Rule of 78's to the economic accrual method.

## CONTENTS

I. Count I

A. *Plaintiffs*

The threshold contention of the plaintiffs is that—the Commissioner abused his discretion in requiring Quincy to change its method of accounting (in allocating interest deductions) from the Rule of 78's to the economic accrual method. Specifically, the plaintiffs aver that the Commissioner abused his discretion in changing Quincy's accounting method because the Commissioner failed to evaluate the operative facts and economic substance of the Quincy transaction. In addition, the plaintiffs contend that the Commissioner erroneously evaluated Quincy's interest deductions *on a transactional basis* as opposed to on an annual basis; in other words, the Commissioner displaced the historical annual accounting period requirement by inappropriately looking at the *full* term of the loan, and not just the taxable years in question, when making his determination that income was not clearly reflected. The plaintiffs further contend that, given the fact that Quincy reports on the accrual basis, the Commissioner abused his discretion by disallowing Quincy's accrued interest inasmuch as that decision was made arbitrarily. Finally, the plaintiffs aver that the Commissioner abused his discretion in relying solely on—(i) the language and assumptions of Rev.Rul. 83–84, which do not have the force and effect of law as do the Code and Treasury Regulations; and (ii) the fact that Quincy's use of the Rule of 78's does not comply with Generally Accepted Accounting Principles (GAAP).

any of the other people present at the meeting, nor could he recall where it took place. In any event, Mr. Hudak testified that Mr. Giese wanted to delay the meeting because FDI wished to seek reconsideration of Rev.Rul. 83–84. He also testified that although his initial contact may have been with Ms. Wassal, he was told by Price Waterhouse, the public accounting firm representing the interests of FDI, that a Mr. Lee McCreary would be handling the examination of the partnership tax returns and any of his documentary requests. When further questioned as to who his contact was with respect to Quincy Associates itself, he responded that he had no contact with anyone from Quincy, only Mr. McCreary at Price Waterhouse. He later indicated, however, that but for a few telephone conversations with Mr. McCreary, he could not recall any meetings in which he met with Mr. McCreary in person to discuss the audit examination. Moreover, when further questioned as to who provided him with the necessary docu-

ments to conduct his audit, he corrected his previous testimony by indicating that, although Mr. McCreary had the ultimate control of the examination, Ms. Wassal was the person with whom he dealt as a representative of Quincy Associates. Tr. 1088–94.

With respect to Mr. Hudak's postponing the examination until *after* April 15, 1984, Mr. Hudak testified that he did not agree to postpone the audit; however, he did admit to the fact that he did not have any documentation available for use to conduct the audit during the time period in question, *i.e.* from October 1983 to April 15, 1984. Tr. 1094–95.

32. Note that Mr. Hudak had not previously requested these documents from Quincy. Tr. 1027. Also, the record indicates that Ms. Doyle provided Mr. Hudak with the amortization schedules sometime in July or August of 1984. Tr. 990.

### B. *Defendant*

Defendant's primary contention, contrary to that of the plaintiffs, is that the Commissioner did not abuse his discretion in determining that Quincy's allocation of interest expense deductions, pursuant to the Rule of 78's, for taxable years 1981 and 1982, did not clearly reflect income and that deductions in excess of the amounts allowable under the economic accrual method were to be disallowed. In this connection, the defendant avers that "no method of accounting is acceptable for federal income tax purposes unless, in the opinion of the Commissioner, it clearly reflects income, ... [and] where the taxpayer's method of accounting does not in the Commissioner's opinion clearly reflect income, the Commissioner may require the taxpayer to change to a method of accounting that does clearly reflect income." The defendant also avers that when determining whether income is clearly reflected with respect to interest on a debt with a term which is greater than one year, one must look at the interest expense as it is allocated over the life of the loan, and not simply to the year in question, because any timing differences in the deduction of interest expense is subject to the "clear reflection of income" requirement of § 446(b).

In addition to the foregoing, the defendant contends that the Commissioner's determination must be upheld unless it is *clearly* unlawful. That is to say, "the Commissioner's determination must be sustained unless—(i) the taxpayer has a specific right or obligation to use its method under specifically applicable income tax statutes or regulations or under mandatory case law; (ii) no factual support exists for the Commissioner's method as clearly reflecting income; or (iii) the taxpayer's method and the Commissioner's method produce substantially identical results." [33] Lastly, the defendant avers that (i) the economic accrual method is a permissible method of accounting for income tax purposes; (ii) the "all events test" does not preclude the Commissioner's use of the economic accrual method; and (iii) the economic accrual method is consistent with the annual accounting concept.

## II. Count III

### A. *Plaintiffs*

First, plaintiffs contend that no issue regarding Quincy's use of the Rule of 78's method of accounting was "raised" and "pending" by the Service on April 2, 1984; thus, Quincy is, therefore, entitled to utilize Rev.Proc. 84–28. More specifically, the plaintiffs aver that no issue regarding Quincy's use of the Rule of 78's was raised by the Commissioner until Revenue Agent Hudak issued his RAR in January of 1985 contending that the IRS would not accept Quincy's interest deductions pursuant to the Rule of 78's. Prior to that time, the plaintiffs contend that Quincy did not know what the Commissioner's position was with respect to any items on Quincy's partnership return.

Lastly, the plaintiffs aver that Quincy was not required to file Form 3115, on this record, as a precondition of enjoying the benefits of Rev.Proc. 84–28, because filing said form would have been a "futile" act, given that Revenue Agent Hudak stated in his RAR that an issue with respect to Quincy's Rule of 78's interest deductions was "raised and pending" on April 2, 1984. Moreover, the plaintiffs contend that by filing Form 3115 with the Commissioner, it would have waived its right to argue in the instant proceeding the fact that Quincy's income was clearly reflected by its use of the Rule of 78's.

### B. *Defendant*

Finally, and with respect to Count III, the defendant contends that Quincy is not entitled to change its method of accounting

---

**33.** According to the defendant, the *only* material facts which this court should consider in its deliberations with respect to the propriety of Quincy's use of the Rule of 78's method of accounting for interest expenses are—the "terms of the involved debt, the duration of the debt, the amount of the taxpayer's losses, the accrual of interest under the taxpayer's method of accounting, the accrual of interest under the Commissioner's method of accounting, and the actual payments made on the debt."

from the Rule of 78's to the economic accrual method using the procedures specified in Rev.Proc. 84–28. Defendant argues that this is particularly true in light of the fact that the Commissioner, not Quincy, changed Quincy's method of accounting, and Rev.Proc. 84–28 requires that the taxpayer initiate the change in the method of accounting. Also, the defendant points out that Quincy failed to file Form 3115, and in order to use the procedures and obtain the benefits of Rev.Proc. 84–28, a taxpayer *must* file Form 3115. In any event, the defendant further avers that even if Quincy had timely filed Form 3115, Quincy, nevertheless, would not have been entitled to utilize the benefits of Rev.Proc. 84–28 because an issue regarding Quincy's interest expense deductions was "raised on audit and was pending on April 2, 1984."

## ISSUES

Given all of the foregoing, we find that the broad threshold issues currently before the court with regard to Count I are—(i) whether the Commissioner abused his discretion pursuant to § 446(b) in determining that Quincy's use of the Rule of 78's method to allocate its interest expense deduction did not "clearly reflect income"; and (ii) whether the method chosen by the Commissioner does "clearly reflect income." Of course, within question (i) there is also the narrower issue of whether Quincy's income is, in fact, clearly reflected. In any event, the final issue at hand is with regard to Count III, and said issue is—whether Quincy is entitled to obtain the benefits of Rev. Proc. 84–28 when required to change its method of accounting for interest deductions from the Rule of 78's to the economic accrual method.

## DISCUSSION

I. Count I .

A. *Brief Overview:*

 It is well settled that in a tax refund suit there is a *strong* rebuttable presumption of the correctness of the determination of the Commissioner. *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); *Danville Plywood Corp. v. United States,* 16 Cl.Ct. 584, 593 (1989); *Tucker v. United States,* 8 Cl.Ct. 180, 186 (1985); *Snap–On Tools, Inc. v. United States,* 26 Cl.Ct. 1045, 1055 (1992). Given this circumstance, and on this record, the taxpayer, therefore, has the heavy burden of overcoming the presumption and establishing his entitlement to a specific deduction by a preponderance of the evidence. *Danville,* 16 Cl.Ct. at 593–94; *Tucker,* 8 Cl.Ct. at 186. Stated differently, "the taxpayer has both the burden of proving, by a preponderance of the evidence, that the deficiency is incorrect and the correct amount of the refund to which he is entitled to recover." *Tucker, id.* More importantly, because deductions under the Internal Revenue Code (Code) are a matter of grace and not of right, *and unless and until the taxpayer can show* by a preponderance of the evidence that a *statute* or *regulation* entitles it to a deduction, the taxpayer will *not* be entitled to such relief. *New Colonial Ice Co. v. Helvering,* 292 U.S. 435, 440, 54 S.Ct. 788, 790, 78 L.Ed. 1348 (1934). In this connection, and relevant to the threshold issues in this case, section 163 of the Code provides that— "[t]here shall be allowed as a deduction all interest paid or accrued within a taxable year on indebtedness." 26 U.S.C. § 163.

However, and notwithstanding the general entitlement provisions of section 163, the method of effecting the tax accounting constrictions of the foregoing is governed by 26 U.S.C. § 446, which provides, in pertinent parts, as follows:

(a) General Rule.—Taxable income shall be computed under the method of accounting[34] on the basis of which the taxpayer regularly computes his income in keeping his books.

(b) Exceptions.—If no method of accounting has been regularly used by the taxpayer, or *if the method used does not*

---

**34.** Method of accounting includes not only the overall method of accounting of the taxpayer (*i.e.,* cash receipts, accrual, or a combination thereof) but also the accounting treatment of any item. Treas.Reg. § 1.446–1(a)(1).

*clearly reflect income*, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income.

26 U.S.C. § 446(b) (emphasis added). Treasury Regulation § 1.446–1(a)(2), interpreting the foregoing provisions, provides, in pertinent parts as follows:

[N]o method of accounting is acceptable unless, in the opinion of the Commissioner, it clearly reflects income. A method of accounting which reflects the consistent application of generally accepted accounting principles in a particular trade or business will ordinarily be regarded as clearly reflecting income, provided all items of gross income and expense are treated consistently from year to year.

26 C.F.R. § 1.446–1(a)(2).

In short, as stated in *Danville*, 16 Cl.Ct. at 594, "to prevail plaintiff is compelled to introduce probative evidence that would lead the court to conclude that the facts upon which it relies (to prove deductibility of subject expenses) are, at the very least, [more] probably true [than not]."

### B. *Interpreting the Code and Its Applicable Regulations:*

■■■ In construing the aforementioned statute(s), this court recognizes that its constitutionally-mandated role is "to interpret the laws, as evidenced by the statutory language, rather than to reconstruct legislative intentions," and unless otherwise specifically defined, "words will be interpreted as taking their ordinary, contemporary, and common meaning." *Snap–On Tools*, 26 Cl.Ct. at 1057. Moreover, "where the language is clear, the courts should not replace that language with unenacted legislative intent, [citations omitted] [and w]hen a statute evidently was drawn with care, and its language is plain and unambiguous, a court cannot supply omissions...." *Id.*[35] This impediment applies with equal force to the Secretary of the Treasury. When interpreting the Code, therefore, the Secretary must promulgate only such treasury regulations which are harmonious with the controlling statute. *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 26, 102 S.Ct. 821, 828, 70 L.Ed.2d 792 (1982). In so doing, the Secretary is assured that "[a] treasury regulation if properly found [by the court] to 'implement the congressional mandate in some reasonable manner,' shall be upheld." *Snap–On Tools*, 26 Cl.Ct. at 1058 (quoting *United States v. Cartwright*, 411 U.S. 546, 550, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973)). However, if, on the other hand, the regulation is found to "alter or amplify the statutory imperative," then it is within the court's power to strike down said regulation as unconstitutional. *Snap–On Tools*, 26 Cl.Ct. at 1958; *see Vogel*, 455 U.S. at 26, 102 S.Ct. at 828.

As emphasized in *Snap–On Tools*, 26 Cl.Ct. at 1057–58 (quoting *Lynch v. Alworth–Stephens Co.*, 294 Fed. 190, 194 (8th Cir.1923), and *United States v. Menasche*, 348 U.S. 528, 538–39, 75 S.Ct. 513, 520, 99 L.Ed. 615 (1955)), the court there stated that:

"The plain, obvious and rational meaning of a statute is always to be preferred to any curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity and study of an acute and powerful intellect would discover." [citations omitted] A statute ... should be interpreted so as to give meaning to all its language. ... "every word Congress used."

■■■ In the instant case, it is evident that both § 163 and § 446 of the Code are written in a clear and unambiguous manner; thus, given this circumstance, the court has no alternative but to "give effect, if possible, to every word Congress [has] used." *Menasche*, 348 U.S. at 538–39, 75 S.Ct. at 519–20. Therefore, in accordance with this mandate, we find that, as a matter of grace, the plaintiffs are entitled to "a deduction [of] all interest paid or accrued within the taxable year on indebtedness," *unless* otherwise provided, *i.e.*, limited, by

---

**35.** As stated in *Iselin v. United States*, 270 U.S. 245, 251, 46 S.Ct. 248, 250, 70 L.Ed. 566 (1926), to supply a perceived omission would "not [be] a construction of a statute, but, in effect, an enlargement of it by the court."

statute. 26 U.S.C. § 163. In this case, such a limiting statute is § 446(b) of the Code. As previously noted, § 446(b) requires that, in addition to the fact that an interest deduction must have been paid or accrued to be allowable, said deduction must also be taken pursuant to a method of accounting which clearly reflects the taxpayer's income. This is so because if said method does *not* clearly reflect income, as originally reported, the Commissioner may thereafter change the taxpayer's method to one which, in the opinion of the Commissioner, does clearly reflect income. 26 U.S.C. § 446(b). In other words, we read § 446(b) such that, in its implementation, it can effectively be divided into three separate events, each occurring in tandem, that is:

(i) the taxpayer must make a reporting determination as to the method of accounting, in his/her or its judgment, that clearly reflects income;

(ii) the Commissioner thereafter examines the taxpayer's return, questions the judgment of the taxpayer with regard to the chosen method of accounting, and administratively determines whether said pre-viously chosen method clearly reflects the taxpayer's income; and

(iii) once the Commissioner concludes that the taxpayer's income is not clearly reflected, as initially determined by the taxpayer's method of accounting, he may then change said method to one that, *"in the opinion of the [Commissioner],"* does clearly reflect income.

With regard to this court's role in these three events, it is the parties' contentions, and we agree, that the court has *de novo* review in all tax refund suits in the Court of Federal Claims. *Warren Corporation v. United States,* 135 Ct.Cl. 305, 314, 141 F.Supp. 935 (1956). This being true, and given that the issue of "whether a given method of accounting clearly reflects income is admittedly a question of material fact," [36] *Thor Power Tool Co. v. Commissioner of Internal Revenue,* 563 F.2d 861, 866 (7th Cir.1977); *Madison Gas & Electric Co. v. Commissioner of Internal Revenue,* 72 T.C. 521, 555, 1979 WL 3772 (1979); and *Artnell Co. v. Commissioner of Internal Revenue,* 400 F.2d 981, 983–85 (7th Cir.1968), it is this court's role, *at first blush,* to review all the disputed operative evidence in the record to determine— whether the taxpayer's method of account-

**36.** We previously noted (fn. 9, *supra*) that the Tax Court, in *Prabel,* 91 T.C. 1101, 1988 WL 138769 (1988), summarily disposed of the merits therein which consisted of the same issues as those contained herein. However, with all due deference to the Tax Court and to the confirming Third Circuit, we respectfully take issue with their summary disposition of the case. Our analysis leads us inescapably to the conclusion that the underlying evidence on the proposed fact issue, *i.e.,* whether income is clearly reflected as reported, is reasonably subject to conflicting interpretations to the end that a summary disposition thereof, at least in this circuit, on this record would constitute reversible error. In this connection, we are impressed by and embrace the analysis in *Greenberg v. Food and Drug Administration,* 803 F.2d 1213, 1215–16 (D.C.Cir.1986), and envision that the CAFC would find the following to be persuasively apposite:

The purpose of summary judgment is "to pierce the pleadings and to assert the proof in order to see whether there is a genuine need for trial." Notes of Advisory Committee on Rules—1963 Amendments. ... if there is no issue of material fact, summary judgment is appropriate. [Citations omitted.] As a threshold matter, the party moving for sum-mary judgment bears the "initial [burden]...." ... *Celotex Corp. v. Catrett,* [477] U.S. [317], [323,] 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)....

[B]ecause summary judgment is a drastic remedy, courts should grant it *with caution* so that no person will be deprived of his or her day in court to prove a disputed material fact issue. As the Supreme Court has reminded us, *the non-moving party is to be given the benefit of the doubt.... If the evidence presented ... is subject to conflicting interpretations, or reasonable persons might differ as to its significance, a summary judgment is improper.... "[S]ummary judgment will only be granted in clear cases."* 10A C. Wright, A. Miller and M. Kane, Federal Practice and Procedure § 2725 at 102 (1983).

\* \* \* \* \* \*

Summary judgment is a drastic step which should not be taken lightly.... *[C]ourts should be careful not to use the device to resolve factual disputes themselves. Even in this day of crowded court dockets, every litigant with a well-pleaded complaint and contested material issues of fact deserves his or her day in court....*

*Id.* 803 F.2d at 1215–16 (emphasis added).

ing, *as initially applied,* clearly reflects income.[37] *Madison Gas & Electric Co.,* 72 T.C. at 555; *German v. Commissioner of Internal Revenue,* 1993 WL 42850, 1993 Tax Ct.Memo LEXIS 60, at *19–20. As previously stated, the taxpayer has the initial discretion, within the parameters prescribed by law, to determine at first instance what method of accounting clearly reflects his/her or its income. After said determination has been made and an accounting method has been utilized, the Commissioner then has the authority, under § 446(b) of the Code, to review the taxpayer's choice of method to determine whether said method in fact clearly reflects the taxpayer's income. In exercising this statutory discretion, the Commissioner may also look primarily to the timing of a particular deduction to determine—whether, in his opinion, the taxpayer's reported income meets the § 446(b) "clear reflection of income" requirement. *Clement v. United States,* 217 Ct.Cl. 495, 510, 580 F.2d 422 (1978); *Burck v. Commissioner of Internal Revenue,* 533 F.2d 768, 773 (2d Cir. 1976); *German,* 1993 WL 42850, 1993 Tax Ct.Memo, LEXIS, at *20. Moreover, there is indisputable obligatory precedent which provides that "[e]ven where the taxpayer's accounting method complies with generally accepted accounting principles [GAAP], the Commissioner may reject it if he determines that it does not clearly reflect the taxpayer's income." *Clement,* 217 Ct.Cl. at 510, 580 F.2d 422; *American Automobile Assoc. v. United States,* 367 U.S. 687, 692, 695, 81 S.Ct. 1727, 1729, 1731, 6 L.Ed.2d 1109 (1961).

### C. *The Commissioner's Discretion:*

■ Based on the foregoing, it is, therefore, clear that under the scheme of § 446(b)—the taxpayer, at first blush, has the discretion to "adopt such … systems [of accounting] as are, *in his judgment,* best suited to his needs" that will clearly reflect income. Regulation § 1.446–1(a)(2) (emphasis added). Thus, the taxpayer, in *selecting* a method of accounting, is constrained only by that which "in his judgment [is] best suited to his needs." Following thereon, and upon audit (or after such a finding at trial), if the method selected does not "clearly reflect income," [38] then taxable income shall be *recomputed* under such method, "*as in the opinion of the Secretary,* does clearly reflect income." Regulation § 1.446–1(b) (emphasis added). Against this background, we are of the view that the court has the authority to review the taxpayer's threshold selection *de novo,* and, in doing so, must determine, *ab initio,* whether the taxpayer's *reported* income is clearly reflected where it utilized the Rule of 78's, and, more significantly, whether the Commissioner abused his discretion in making his determination that income *as reported* was not clearly reflected.

With respect to this task, the court's *de novo* review, as to whether the taxpayer's *initial* selection of its method of accounting (the Rule of 78's allocation of interest expense) clearly reflects income, is not constrained by the last clause of § 446(b), *i.e.,* "in the opinion of the Secretary." We take this position notwithstanding Treasury Regulation § 1.446–1(a)(2), which provides that—"no method of accounting is acceptable unless, *in the opinion of the Commissioner,* it clearly reflects income" (emphasis added).

It is obvious to the court that the Commissioner is given the discretion to make

---

37. Because a strong public policy in favor of ensuring litigants a complete hearing on the merits of a claim exists in federal courts, it was this court's opinion that, given the apparent genuine issue(s) of material fact present in the instant case, or by construing any such doubt in plaintiffs' favor, it was the court's duty to go to trial to determine—whether Quincy's income was clearly reflected as reported by its use of the Rule of 78's. *See Greenberg,* 803 F.2d at 1216.

38. Regulation § 1.446–1(a)(2), defines "clearly reflecting income," as follows: "A method of accounting which reflects the consistent application of generally accepted accounting principles in a particular trade or business in accordance with accepted conditions or practices in that trade or business will ordinarily be regarded as clearly reflecting income, provided all items of gross income and expense are treated consistently from year to year." *Spang Industries, Inc. v. United States,* 791 F.2d 906, 909 (Fed.Cir. 1986).

three determinations with respect to the overall scheme under § 446(b); however, the first (whether no method of accounting has been regularly used) is not an issue in this case. The remaining two are—(i) whether, as reported, the taxpayer's income is or is not clearly reflected; and (ii) if the taxpayer's income is *not* clearly reflected, the Commissioner may change said method to a method which, *in his opinion,* clearly reflects income. *Asphalt Products Co., Inc. v. Commissioner of Internal Revenue,* 796 F.2d 843, 847 (6th Cir.1986). These two delineated determinations, however, are to be reviewed by this court in a different manner in light of the explicit statutory language. The first, we hold, is entitled to *de novo* review at trial, while the second is not.

With respect to the first determination, we so find because the *statute* does not provide that the decision—whether the taxpayer's income is clearly reflected—shall be measured only by *"the opinion of the Secretary,"* as does the regulation. Instead, we read it to merely grant the Commissioner/Secretary the discretion to make his determination as to whether *reported* income is clearly reflected, but does not preclude the court, at trial, from making its own *de novo* determination as to—whether income is clearly reflected *as reported.* In other words, the court recognizes that the Commissioner has "broad discretion to modify a taxpayer's accounting method to insure a clear reflection of income" in his opinion, *Clement,* 217 Ct.Cl. at 509–10, 580 F.2d 422, and that said discretion should be upheld unless "clearly unlawful or plainly arbitrary," *Thor Power Tool Co. v. C.I.R.,* 439 U.S. 522, 532–33, 99 S.Ct. 773, 780–81, 58 L.Ed.2d 785 (1979). This discretion, however, may not be exercised according to § 446(b) *unless* the taxpayer's reported method of accounting does not clearly reflect income, which is subject to this court's *de novo* review. Obviously then, the threshold issue before this court becomes—whether the taxpayer's income is clearly reflected by his selected method of accounting. For if it is not, then according to § 446(b) there is no abuse of discretion where taxable income is recomputed under

a method of accounting as, *in the opinion of the Secretary,* does clearly reflect income. *See Spang Industries,* 791 F.2d at 913–14; *Morgan Guaranty Trust Co. v. United States,* 218 Ct.Cl. 57, 71, 585 F.2d 988 (1978); *Asphalt Products,* 796 F.2d at 849. It is, therefore, in this connection that the court's § 446(b) role, in determining whether the taxpayer's income has been clearly reflected, is made readily apparent. *See Spang Industries,* 791 F.2d at 909; *Morgan Guaranty Trust,* 218 Ct.Cl. at 72, 585 F.2d 988, *Clement,* 217 Ct.Cl. at 512, 580 F.2d 422; *Asphalt Products,* 796 F.2d at 849; *B.A. Ballou and Company, Inc. v. United States,* 7 Cl.Ct. 658, 664 (1985).

In reviewing this explicit grant of authority, it is patently clear from the statute, therefore, that Congress has, in this instance, only given the Commissioner wide latitude in determining *which corrective method* of accounting he deems appropriate *to clearly reflect the taxpayer's income,* after a finding that the taxpayer's selected method does not do so. In this circumstance, it is not within the court's discretion to second guess the Commissioner and substitute its own determination as to what method is the most appropriate to clearly reflect, *i.e., correct,* the taxpayer's income. *Thor,* 439 U.S. at 532–33, 99 S.Ct. at 780–81; *United States v. Catto,* 384 U.S. 102, 114, 86 S.Ct. 1311, 1317, 16 L.Ed.2d 398 (1966) ("It is not the province of the court to weigh and determine the relative merits of systems of accounting.") If the court finds, *de novo,* that the taxpayer's method of accounting does not clearly reflect income, as reported, in such case, the court may go no further than to sustain the Commissioner's choice, if it finds such choice to be reasonable, despite the court's justified belief that there may be a better method of accounting by which the taxpayer's income may be clearly reflected. This being the case, it is apparent that the amount of latitude which must be given to the Commissioner as to its second determination under § 446(b), *i.e.,* what method of accounting, in the opinion of the Commissioner, clearly reflects the taxpayer's income, is considerably more expansive than the quantum of the latitude which is given

to the Commissioner with respect to his first determination under § 446(b), *i.e.,* whether the taxpayer's income, at first instance, is clearly reflected. In short, we read the clause "in the opinion of the Secretary [Commissioner]" at § 446(b) as relating to the discretion applicable to the accounting method selected in the *recomputation* of taxable income.

Given the foregoing, we find that the issues remaining before this court are—(i) whether Quincy's income is clearly reflected by its use of the Rule of 78's in allocating the deduction of its interest expenses; (ii) whether the Commissioner has abused his discretion in determining that Quincy's income is not clearly reflected; and, if not, (iii) whether the Commissioner's determination to change Quincy's method from the Rule of 78's to the economic accrual method in order to clearly reflect its income is a reasonable one.

### D. *Whether Quincy's Reported Taxable Income Is Clearly Reflected By the Rule of 78's:*

█ Our threshold question herein is— whether the plaintiffs have met their heavy burden of proof by overcoming the presumptive correctness of the Commissioner's determination that Quincy's income was not clearly reflected by its use of the Rule of 78's in deducting its interest expenses. First and foremost, interest is defined as the cost associated with the use or forbearance of money. *Deputy v. du Pont,* 308 U.S. 488, 497, 60 S.Ct. 363, 368, 84 L.Ed. 416 (1940); *Old Colony R.R. Co. v. Commissioner of Internal Revenue,* 284 U.S. 552, 560–61, 52 S.Ct. 211, 213–14, 76 L.Ed. 484 (1932). According to the facts herein, Quincy borrowed $2,279,000 from FDEC, an affiliated corporation, in November of 1980; and, in order to recover the cost of its forbearance of said amount, FDEC charged Quincy $4,989,249 in interest to be paid over the next 23 years and two months. A stated interest rate was conspicuously absent from the Note. With regard to the gross interest charge of $4,989,249, while there is no issue whether Quincy is entitled to deduct said amount over the term in full, the issue here is

simply one of timing, *i.e.,* the manner in which Quincy has attempted to deduct said amount, avers defendant, does not clearly reflect its income. In other words, to the extent that Quincy's interest deductions, taken pursuant to the Rule of 78's, exceed the deductions allowable under the economic accrual method, the defendant avers that said deductions do not clearly reflect income.

In reviewing defendant's contention that Quincy's income was materially distorted in that it was not clearly reflected as a consequence of the use of the Rule of 78's, we rely heavily upon the rationale in *Clement,* 217 Ct.Cl. 495, 580 F.2d 422. In that case, the Court of Claims, as in the instant case, was faced with the single issue of—whether the taxpayer's income for the year in question was "clearly reflected" by the method of accounting chosen by the taxpayer. *Clement,* 217 Ct.Cl. at 509, 580 F.2d 422. There the particular issue at hand was not whether the taxpayer was entitled to receive a deduction but, rather, what proportion of his deduction was attributable to the tax year in question. Stated differently, the ultimate issue there, as here, was the *timing* of the deductions, not the deductibility of the expense. *Id.* at 510, 580 F.2d 422. Here at bar, Quincy contends that *its use of the Rule of 78's clearly reflects its income* because (i) the evidence in the record establishes that there was a legitimate business purpose for its deductions; (ii) the transaction in which it entered into with FDEC represented the economic reality of the then existing business/market conditions; and (iii), Quincy's interest deductions each period comported with market rates for comparable loans at the time the Quincy loan was made.

We disagree with each of these contentions. The fact of the matter is that the Rule of 78's, in its implementation at bar, neither contemplated nor embraced any of the foregoing circumstances. To the contrary, that allocation rule is simply an unadulterated arbitrary formula which has *absolutely no relationship* to any market forces whatsoever. In essence, the Rule of 78's merely affects a mechanically precon-

ceived desired result, *i.e.*, in short, it is a manipulative mechanism. Stated gently, the Rule of 78's merely hospitably allocates, or artificially spreads, a predetermined amount of an item such as gross interest charged on a note over the life of the loan. It is indisputable that the Rule of 78's does not *compute* interest, but, rather, it merely *allocates* it, as desired. The obvious purpose, of course, on the facts at bar is to accelerate interest deductions in the earlier years to effect a positive cash flow. Given this scheme, we hold that the mechanical application thereof is totally insensitive to traditional market forces usually considered by lending institutions. More specifically, when determining the amount of interest to be allocated to a tax year, pursuant to the Rule of 78's, taxpayers do not consider factors such as market forces,[39] inflation, risks, and general business conditions *in their allocation factors;* instead, the Rule of 78's is implemented by simply taking the total interest for the loan period and multiplying said gross figure by a fraction, the numerator of which is composed of the number of remaining periods

on the indebtedness and the denominator is the sum of the periods' digits for the term of the indebtedness.[40] *Prabel*, 882 F.2d at 825. Nowhere in said fraction is there a factor that manifests the implication of the market interest rate, the risks associated with the transaction, or inflation; said factors have, of course, previously been taken into account by the lender when determining what *gross amount* of interest to charge initially, *i.e.* in this case, the $4,989,-249. It is quite obvious to the court, therefore, that when determining what amount of interest to charge Quincy, FDEC must have considered the risks involved, the interest rates at the time, and any other relevant business conditions. These considerations, however, were imparted by Quincy only in the *calculation* of interest and not in the use of the Rule of 78's by the bland and mechanical allocation of interest. When determining—whether a taxpayer has, under these circumstances, properly allocated his interest deductions—the court must look to the overall timing or spread of the total expense over the life of the loan.[41]

**39.** Quincy contends that it could not have obtained a loan at 11.77%, *infra*, in 1980 because the interest rates in the market at that time were between 18–20%. Said contention may be true with respect to the market rate of interest as between two independent entities engaging in a similar transaction to that of Quincy and FDEC's. However, such is not the case given the evidence in this record. It has been clearly established that FDEC and Quincy are affiliated entities, in that FDEC is a general partner of Quincy. In this connection, the Third Circuit held in *Prabel*, 882 F.2d at 822, and we agree, that: "The terms of the transaction including the terms of the note were the result of dealings between related entities and were not the result of arms-length negotiations." It has also been clearly established that the economic accrual rate for the Quincy transaction is 11.77%. Moreover, established case law supports the position that where a taxpayer has exercised his freedom to organize his affairs as he sees fit, he must then accept the tax consequences of those actions. *Commissioner v. National Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149, 94 S.Ct. 2129, 2137, 40 L.Ed.2d 717 (1974).

**40.** The Third Circuit noted that the Tax Court used the following to explain the Rule of 78's:
The rule of 78's is based on the idea of a 12–month loan repayable in equal installments. If the borrower takes out a $1200 loan, he has the use of 12 $100 bills the first month, 11

$100 bills the second month, 10 the third month, and only one the last month. During the full 12 months, he therefore has the use of 78 $100 bills (12 plus 11 plus 10 * * * plus 1). The number 78 becomes the denominator of the fraction, while the numerator depends upon when prepayment takes place. If prepayment is made at the 7th installment, 57/78 of the total finance charge [is regarded as having] been earned by the creditor (the numerator is the sum of 12, 11, 10, 9, 8, 7). * * * this would amount to 57/78 of $211.68 [the total interest due on the loan], or approximately $155. Therefore, [the debtor's] rebate due on August 1 would be approximately $57. [1 J. Fonesca, Handling Consumer Credit Cases, sec. 3:7, at 101 (3d ed. 1986). Fn. ref. omitted.]
*Prabel*, 882 F.2d at 825. It was further noted that—"[w]here a loan has more than 12 [payment] periods, the sum of the years' digits is greater than 78." *Id.*

**41.** The court adopts the Third Circuit Court of Appeals' holding in *Prabel* which states that "it was not improper for the Commissioner or the Tax Court to determine the economic reality of the transactions occurring in the relevant accounting periods *by reference to the whole term of the note* [in determining whether income was clearly reflected in the operative years in issue]." *Prabel*, 882 F.2d at 828. *Also compare Clement*, 217 Ct.Cl. at 510–11, 580 F.2d 422.

This is true because *Clement*, 217 Ct.Cl. at 510, 580 F.2d 422, teaches that improper "timing of [a deduction] ... distorts income" (citations omitted). Whereas here, the Note in question being for the long term of 23 years and 2 months, we find that Quincy's income is distorted by the fact that the utilization of the Rule of 78's improperly bunches a substantial disproportionate amount of the interest due to be paid into the early years of the loan, and by so doing leaves a *negligible* amount of interest to be allocated in the later years of the loan.[42] This impermissible and distortive situation is clearly evidenced by Appendix A attached hereto and incorporated by reference. In reviewing Appendix A, one can see that in the early years of the loan, *i.e.* 1981–1985, Quincy accrued by use of the Rule of 78's a total of $1,902,760 in interest, while in the last five years of the loan, Quincy's interest expenses amount to only $235,434.[43] Whereas, had Quincy claimed its interest deduction for the same periods based on the economic accrual method, the deduction for the 1981–1985 period would have been $1,115,136 and for the 1999–2003 period would be $1,091,620. In addition, Table 4 of Dr. Bildersee's report in PX 16, which purports to approximate the interest rates applicable to the Quincy transaction under the economic rate, the Rule of 78's, and the constant rate, or economic accrual rate, and attached hereto as Appendix B, depicts the interest rate for the Quincy loan in 1981 to be approximately 18.80%; in 1982—17.71%; in 1983—16.74%; in 1984—15.34%; and in 1985—13.70%. However, with respect to the years 1999 to 2003, the following rates are depicted: 3.20%, 2.62%, 2.00%, 1.30%, and .50%, respectively. Obviously, said drastic change in interest rates over the term of the loan, we find, reflects and corroborates the distortive nature of the Rule of 78's method of mechanically *allocating* gross interest. In addition to the foregoing, there are numerous other factors which are found, on this record, to support the fact that Quincy's income is not clearly reflected in that it is distortive by its use of the Rule of 78's. Several of these include the fact that (1) in the first 12 years of the loan, Quincy's annual interest accruals, pursuant to the Rule of 78's, exceed in each such year the amount of annual payments due on the loan; (2) no interest is accrued on the unpaid amount of inter-

**42.** Moreover, the Tax Court in *Prabel* noted that in 1973, the American Institute of Certified Public Accountants (AICPA) provided that:

Because sum-of-digits [Rule of 78's] calculations running over a long number of years produce results which are materially different from those obtained by using other mathematical techniques, its use in applying the effective yield method should be limited to contracts and loans with initial maturities of not more than 84 months.

AICPA Industry Audit Guide: Audits of Financial Companies 37 (1973).

**43.** Said allocations are illustrated as follows:

| Year | Rule of 78's Interest Deducted | Economic Accrual Interest |
|---|---|---|
| 1981 | $ 417,604 | $ 249,847 |
| 1982 | 399,078 | 233,415 |
| 1983 | 380,552 | 216,349 |
| 1984 | 362,026 | 207,659 |
| 1985 | 343,500 | 207,866 |
| TOTAL | $1,902,760 | $1,115,136 |

| Year | Interest Deducted | Interest |
|---|---|---|
| 1999 | $ 84,139 | $ 215,618 |
| 2000 | 65,612 | 216,813 |
| 2001 | 47,087 | 218,156 |
| 2002 | 28,560 | 219,667 |
| 2003 | 10,036 | 221,366 |
| TOTAL | $235,434 | $1,091,620. |

est; and (3) under the Rule of 78's, Quincy does not begin to curtail its principal until 1993, that is, the "scheduled payments on the note are not related to the amount of accrued interest deductions under the Rule of 78's." *Prabel*, 91 T.C. at 1119.[44] Thus, in essence, what Quincy has created, as a result of bunching/accelerating the interest deductions up front, is a deferment of tax to the later years of the loan where the annual deductions will be substantially less. This circumstance offends "the policy that tax consequences should be based on business reality and not on mere events created to avoid taxes." *Clement*, 217 Ct. Cl. at 505, 580 F.2d 422. Given the foregoing, we find that Quincy's income for each of the taxable years in question was distorted and not clearly reflected by its use of the Rule of 78's; thus, the taxpayers' income herein is also not clearly reflected. *See Clement*, 217 Ct.Cl. at 512, 580 F.2d 422.

### E. *Whether the Commissioner Abused His Discretion:*

In light of our findings above, our next inquiry becomes—whether the Commissioner abused his discretion in determining that Quincy's income was not clearly reflected by its use of the Rule of 78's. Obviously, given this court's finding that Quincy's income was, in fact, distorted and not clearly

reflected by its use of the Rule of 78's, the taxpayers herein have necessarily failed to carry their heavy burden of proof in that they have not only failed to rebut the Commissioner's presumption of correctness, but they also have failed to establish by a preponderance of the evidence that the Commissioner's actions were "clearly unlawful" or "plainly arbitrary." *Thor*, 439 U.S. at 532–33, 99 S.Ct. at 780–81. This being true, the plaintiffs' contentions that the Commissioner abused his discretion in changing Quincy's accounting method from the Rule of 78's to the economic accrual method because he failed to evaluate the facts and economic substance of the Quincy transaction,[45] acted arbitrarily, relied solely on Rev.Rul. 83–84 in making his determination,[46] and inappropriately considered Quincy's interest deductions on a transactional basis as opposed to on an annual basis,[47] are without support based on the facts in this record. This is particularly true in light of the fact that we find that the Commissioner's determination that Quincy's income was not clearly reflected, as reported, by its use of the Rule of 78's is correct. Moreover, because said determination is correct under § 446(b), we cannot and do not find that the Commissioner's determination that Quincy's income was

44. Although the Note indicates that, upon prepayment, Quincy must pay to FDEC all interest accrued pursuant to the Rule of 78's, said fact is unilaterally controlled by Quincy, as indicated in *Prabel*. 91 T.C. at 1118. Moreover, as noted in *Prabel*, and adopted by this court, the fact that the transaction itself was not made pursuant to arms-length negotiations diminishes the amount of credence by which this court may give to the obligatory terms of the Note. *Id.* *See* note 13, *supra*, and accompanying test.

45. The defendant has stated in its brief that the government does not question the economic substance of the Quincy transaction; its only issue is with respect to the improper timing of Quincy's deductions.

46. Although we find that in this instance the plaintiffs are correct in stating that the Commissioner obviously relied heavily, if not solely, upon Rev.Rul. 83–84 in denying Quincy its interest expense deductions under the Rule of 78's, said circumstance does not, *ipso facto*, alter this court's *de novo* findings that Quincy's interest deductions in each year in issue did not, nevertheless, clearly reflect its income. Conse-

quently, the Commissioner did not abuse his discretion in determining the same, irrespective of his methodology. This is also true, irrespective of the fact that a revenue ruling does not have the force and effect of law, *Spang*, 791 F.2d at 913, because in this instance the Commissioner's application of Rev.Rul. 83–84 achieved the correct result, notwithstanding.

In addition to the foregoing, plaintiff also contends that the Commissioner abused his discretion in relying solely on the fact that the Rule of 78's does not conform with GAAP. After a careful review of the Mr. Hudak's Revenue Agent Report, however, the court finds no such reliance upon GAAP as stated by the plaintiffs.

47. With regard to this contention, the court has previously ruled that it adopts the Third Circuit's position in *Prabel*, which holds that "a reference to the whole term of the loan" in order "to determine the economic reality of the transaction occurring in the relevant annual accounting periods" is not "improper." *Prabel*, 882 F.2d at 827–28.

not clearly reflected by its use of the Rule of 78's, is "clearly unlawful" or "plainly arbitrary." In view of the foregoing, we also rely on relevant and applicable case law which supports the proposition that, where a court has determined *de novo* that a taxpayer's income was not clearly reflected by his method of accounting, the Commissioner's determination of said fact shall be upheld inasmuch as there is a failure to establish an abuse of discretion. *See Spang Industries*, 791 F.2d at 913–14; *Morgan Guaranty Trust*, 218 Ct.Cl. at 71, 585 F.2d 988; *Asphalt Products*, 796 F.2d at 849.

### F. The Commissioner's Method of Accounting—The Economic Accrual Method:

■ The final issue before this court with regard to Count I is—whether the corrective method chosen by the Commissioner is a reasonable one by which Quincy's income may be clearly reflected. According to the facts in the instant case, the Commissioner changed Quincy's method of accounting for interest deductions for the term of the loan from the Rule of 78's to the economic accrual method. The economic accrual method is a method which takes into account the real or effective rate of interest. In other words, the method applies a uniform interest rate over the term of the loan which is based on the amount of the loan and the repayment schedule provided in the loan agreement, which, when applied to the unpaid balance of the indebtedness for a given period, will produce the true cost of that indebtedness for that period. *Prabel*, 882 F.2d at 824. In the opinion of the Commissioner, the economic accrual method is the method which best reflects Quincy's income, and, in view of the wide latitude which Congress has given to the Commissioner in determining which method *in his opinion* clearly reflects income, we are constrained to agree. In

reviewing the intricacies of the economic accrual method, we find said method to be a reasonable and non-distortive method by which Quincy's income may be clearly reflected. This is particularly true in light of the well-established principle that "where respondent [the Commissioner] has correctly determined that a taxpayer's method of accounting does not clearly reflect income, a presumption exists as to the correctness of the method of accounting respondent [the Commissioner] selects for the taxpayer." *Prabel*, 91 T.C. at 1119.[48] Accordingly, we hereby sustain the Commissioner's determination that Quincy's method of accounting for interest deductions should be changed from the Rule of 78's to the economic accrual method. Plaintiffs consequently argue that to the extent that the court finds the Commissioner's determination to be correct, *i.e.*, that the Commissioner properly applied § 446(b), then in such case, they contend that they are entitled to receive the benefits of Rev.Proc. 84–28.

### II. Count III

■ Rev.Proc. 84–28 provides a "mandatory procedure for taxpayers to change their method of accounting for interest on indebtedness when they have been reporting interest income or deductions in accordance with the Rule of 78's computation."[49] Rev.Proc. 84–28, 1984–1 C.B. 475. That is, in such circumstance, a taxpayer must reallocate his interest deductions to the appropriate period of the loan as determined pursuant to the economic accrual method instead of the Rule of 78's method. This revenue procedure "applies to lenders and borrowers, who report interest income or who claim interest deductions with respect to loans using the Rule of 78's method." Specifically, the revenue procedure applies to loans with respect to which the interest computed using the Rule of 78's exceeds the loan payments during any year of the term of the loan. *Id.*

---

**48.** The *Prabel* court also pointed out that the economic accrual method has been recognized for years by the accounting industry as a method by which to allocate premiums and discounts on debt obligations over the terms of the loan. *Prabel*, 91 T.C. at 1120.

**49.** For consumer loans described in Rev.Proc. 83–40, *i.e.*, short-term consumer loans, the change is not mandatory.

It is basic and fundamental that under Internal Revenue Code § 446(e),[50] a taxpayer must first obtain the consent of the Commissioner in order to change a method of accounting for federal income tax purposes. In addition, Treasury Regulation § 1.446–1(e)(3)(i) requires that, in order to obtain such consent, application Form 3115 must be filed within 180 days after the beginning of the tax year in which the taxpayer desires to make the change, and § 1.446–1(e)(3)(ii) further authorizes the Commissioner to prescribe various administrative procedures deemed necessary to obtain consent to change one's method of accounting. Lastly, § 481 of the Code requires that—"those adjustments necessary to prevent amounts from being duplicated or omitted be taken into account when the taxpayer's taxable income is computed under a method of accounting different from the method used to compute taxable income for the preceding tax year." Rev.Proc. 84–28, § 2.06. Moreover, § 481(c) and § 1.481–5 of the regulations provide that the manner in which the taxpayer must account for said § 481 adjustment is subject to the conditions agreed to by the Commissioner and the taxpayer. *Id.*

Given the foregoing, Rev.Proc. 84–28 waives the 180–day rule under § 1.446–1(e)(3)(ii) and grants consent under § 1.446–1(e)(2)(i) to taxpayers who change their method of accounting for interest on indebtedness from the Rule of 78's to the economic accrual method, *i.e.*, the "prescribed method." Rev.Proc. 84–28. This consent, however, is only granted for the first tax year ending on or after December 31, 1983, and only for those taxpayers who comply with the provisions of Rev.Proc. 84–28. Said provisions are as follows: (i) taxpayers must change their method of accounting for their first tax year *ending* on or after December 31, 1983; (ii) taxpayers must file Form 3115, Application for Change in Accounting Method, with the Commissioner on or before the due date of the taxpayers' federal income tax return

for such year, or no later than the extended time period prescribed in § 6081 of the Code and the regulations thereunder whether or not the taxpayers have, in fact, been granted an extension of time for filing its income tax return for such year; and (iii) with respect to the taxpayers' return, if said return is under examination at this time, an issue with respect to "the amount of a claimed interest deduction" must not have been "raised and pending on April 2, 1984." *Id.*

In addition to the grant of consent, a taxpayer who complies with the aforementioned three requirements will also be entitled to other benefits under the revenue procedure. More specifically, these benefits include allowing the taxpayer, under certain circumstances, to spread out his § 481(a) adjustment to taxable income over an extended number of tax periods, as opposed to including the entire adjustment in the year of change. Rev.Proc. 84–28, § 3.04. By providing this type of benefit, the Commissioner is recognizing that allowing the § 481(a) adjustment to be spread over a number of years will "encourage taxpayers to change their accounting practices to comply with the regulations." *South Side Control Supply Co., Inc. v. United States*, 44 T.C.M. (CCH) 1383, 1982 WL 10887 (1982). In addition, the multiyear spread will also "make it more appealing to taxpayers by smoothing out the income effect and eliminating distortions in taxable income which might otherwise arise as a result of the change due to the operations of section 481(a)." *Id.* It is this benefit with respect to which Quincy hopes to obtain in the instant proceeding. However, as previously stated, in order to obtain said benefit, the taxpayer must have complied with the mandatory revenue procedures. Therefore, in order to determine whether the taxpayer has done so, we must now apply the facts of this case to the relevant law and procedures.

---

**50.** I.R.C. § 446(e) provides, in pertinent part, that "... a taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books *shall*, before computing his taxable income under the new method, secure the consent of the Secretary." Regulation § 1.446–1(e)(2)(1) (emphasis added).

It is well-established law that revenue procedures do not have the force and effect of treasury regulations. In fact, the opening cover under the Introduction topic of the Cumulative Bulletin specifically states as follows:

> Revenue Rulings and Revenue Procedures reported in the Bulletin do not have the force and effect of Treasury Department Regulations (including Treasury Decisions), but are published to provide precedents to be used in the disposition of other cases, and may be cited and relied upon for that purpose.

*Fruehauf Corp. v. United States*, 201 Ct. Cl. 366, 374, 477 F.2d 568 (1973). Additionally, the Federal Circuit Court of Appeals (CAFC) stated in *Dillon, Read & Co., Inc. v. United States*, 875 F.2d 293 (Fed.Cir. 1989), that "[a]lthough Revenue Procedures are not given the effect of Treasury Regulations, which are to be sustained unless disharmonious with the controlling statute, [citations omitted], they are official statements of the IRS on procedural matters and are published to promote uniform application of the Internal Revenue Laws." *Id.* at 299. This being true, it is clear that once the Commissioner has established and published a revenue procedure, particularly one that is mandatory in nature, the taxpayer is subsequently put on notice as to the Service's position as to a particular matter, and must therefore choose to either voluntarily comply with that position, or assert his/her own position on examination. In either case, the taxpayer is subject to the consequences of his actions.[51] In the case at bar, Quincy was given the opportunity under Rev.Proc. 84–28 to change its method of accounting from the Rule of 78's to the economic accrual method as provided by the provisions of the foregoing revenue procedure. Instead, Quincy chose not to comply with said revenue procedure and thus failed to file Form 3115 on or before April 15, 1984, or by June 14, 1984, the extended time period provided under § 6081.

■ Given the foregoing, Quincy hospitably argues, notwithstanding, that it failed to file Form 3115, because (i) it believed that its income was clearly reflected as reported under the Rule of 78's, despite the IRS's stated position in Rev.Rul. 83–84, and it was, therefore, not required to file Form 3115, inasmuch as in doing so may or would have caused it to waive its right to litigate herein; (ii) by filing a timely Form 3115, Quincy would have had to reapply to change its method back to the Rule of 78's if it were to win in this proceeding, and if he so desired, the Commissioner could have denied said second application to Quincy's detriment; and (iii) Revenue Agent Hudak erroneously stated in his RAR that an issue was "raised and pending" on April 2, 1984, with respect to the propriety of Quincy's interest deductions pursuant to the Rule of 78's. With respect to this latter contention, that is, whether or not an issue was "raised and pending" with regard to Quincy's interest deductions on or before April 2, 1984, it is the court's view that said issue must be addressed first, in that, if an issue with respect to Quincy's Rule of 78's interest deductions was in fact "raised and pending" on April 2, 1984, the question of whether or not Quincy should have filed a Form 3115 is moot in light of the fact that Rev.Proc. 84–28 would not then apply to Quincy. Rev.Proc. 84–28, § 3.08. In that connection, the revenue procedure specifically provides that:

> This revenue procedure *does not* apply to a lender or a borrower who uses the rule of 78's method and whose reported interest income or claimed interest deductions exceeds the loan payments made during any of the tax years of the loan, *if an issue concerning the amount of reported interest income or claimed interest deduction has been raised and is pending on April 2, 1984, in connection with*

---

51. In *National Alfalfa*, the Supreme Court stated "[t]his Court has observed repeatedly that, while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the *tax consequences* of his choice, whether contemplated or not, [citations omitted], and may not enjoy the benefit of some other route he might have chosen to follow but did not." *National Alfalfa,* 417 U.S. at 149, 94 S.Ct. at 2137.

*the examination of the taxpayer's federal income tax return.*

Rev.Proc. 84–28, § 3.08 (emphasis added). Against this background, we now address the question—whether an issue was "raised and pending" with respect to Quincy's interest deductions in issue on or before April 2, 1984. Our analysis of the operative facts in this record compels us to conclude that an issue was *not* "raised and pending" with regard to Quincy's Rule of 78's deductions on April 2, 1984. This finding is patently clear because, as of April 2, 1984, we find that Revenue Agent Hudak was still in the process of marshalling the operative documents necessary for him to complete his investigation and make a determination regarding Quincy's partnership return(s); thus, Mr. Hudak could not have "raised" the issue in the context of the plain and generic meaning of that word with respect to Quincy's interest deductions *prior* to obtaining any of Quincy's books and records.

We find, in connection with the foregoing, that Webster's Dictionary defines the word "raised" to mean—"to put forth for consideration." *See* Webster's II New Riverside University Dictionary 972 (1984); *Mulholland,* 16 Cl.Ct. at 266. Thus, in order for an issue to be "raised" in this context, we believe that three events must occur. First, the revenue agent must inquire into or investigate the taxpayer's income and deductions, that is, he must obtain relevant documentary information as to the items with respect to which he seeks to address and verify. Once he has confirmed that the taxpayer has acted in a certain manner, he must then determine whether or not the taxpayer has complied with the provisions of the Code and applicable Treasury Regulations. If he finds that the taxpayer has not so complied, then the third and final step in this process is to "raise" the issue of the taxpayer's noncompliance *with the taxpayer;* in other words,

he must put forth for the *taxpayer's* consideration the issue of—whether or not the taxpayer has complied with federal tax statutes with regard to whatever item of income or expense is at issue. *See Mulholland,* 16 Cl.Ct. at 266–67. It is only at this point, we believe, that an issue has been "raised" with the taxpayer with respect to the correctness of his reported taxable income. According to the record facts at bar, Ms. Wassal testified that Mr. Hudak agreed to suspend the audit, and he did not again contact FDI after October 1983 with respect to the partnership audits until sometime *after April 15, 1984.* Although Mr. Hudak denies that he ever agreed to suspend the audit, he does admit to the fact that he did not have any documentation to use to conduct the audit from October 1983 to April 15, 1984. Moreover, the record establishes that Mr. Hudak did not receive his requested documents until sometime *after May 24, 1984,* the date on which he issued a *second* formal written request letter, asking for amortization schedules for the economic accrual and the Rule of 78's methods of accounting, payment schedules, partnership agreements and loan documents, all necessary documents in order to determine—whether Quincy was improperly deducting excess interest expenses. Given the totality of the record evidence on this issue, and the reasonable inference deducible therefrom, we find plaintiffs' evidence, *supra,* to be more credible than not. Therefore, we find that the issue with respect to Quincy's interest deductions was *not* even "raised," *i.e.,* "put forth for consideration," as of April 2, 1984, let alone "pending" at that time.[52] In view of the above, and pursuant to the provisions of Rev.Proc. 84–28, § 3, Quincy is a taxpayer to which the revenue procedure applies under the first prong of the test; thus, we must next address Quincy's other two contentions as to why it did not file Form 3115 *as required* by the revenue procedure.[53]

---

52. It is important to note that Rev.Proc. 84–28 requires that an issue must be *both* "raised *and* pending" on April 2, 1984. Rev.Proc. 84–28, § 3.08 (emphasis added).

53. Note that § 6.01 of Rev.Proc. 84–28 provides that:

Taxpayers to which this revenue procedure applies *must* effect the change in their methods of accounting for their first tax year *ending* on or after December 31, 1983, pursuant to the provisions set forth in this revenue procedure *by filing a current Form 3115,* Ap-

■ First, with respect to Quincy's contention that it was *not* required to file Form 3115 because its income was clearly reflected as reported, this court has previously stated that taxpayers are free to choose whether or not they will comply with the IRS' revenue procedures, as said procedures do not have the force and effect of law, but are merely the Commissioner's official statement as to how a particular item should be accounted for federal tax purposes. These revenue procedures do, however, have great value to both the government and the taxpayer, in that they provide an opportunity for both parties to be made aware, from the outset, of the manner in which specific aspects of the Code will be treated by the IRS, in the hopes of avoiding the expense and delay of litigation. *See Rosenberg v. Commissioner of Internal Revenue,* 450 F.2d 529, 532 (10th Cir.1971). However, in choosing whether to voluntarily follow the Commissioner's pronouncements, the taxpayer is taking the risk that not only will he be subject to examination by the Service, but also that he will be assessed additional taxes and interest and, if applicable, penalties. Thus, given this available choice, the taxpayer must carefully weigh the consequences before deciding upon his course of action. In the matter at hand, Quincy took the position that it need not comply with Rev.Proc. 84–28 because its method of accounting clearly reflected its income pursuant to the Rule of 78's, and that it did not wish to waive its right to litigate said fact by filing Form 3115. This approach was taken notwithstanding the fact that even in its Private Placement Memorandum, Quincy *admitted* "that there is no authority specifically approving the use of such [Rule of 78's] method." *See Mulholland,* 16 Cl. Ct. at 267–68.

First, it is clear to the court that there is nothing in Rev.Proc. 84–28 which requires Quincy to waive its right to litigate its position with respect to the Rule of 78's. In any event, Quincy could have easily ameliorated its misgivings by filing a "protective" Form 3115. It did not, and offered no reason for such failure. Consequently, against this background, we see Quincy's position to reflect nothing more than an afterthought. It is, therefore, clear from the record that Quincy chose to pursue its inflexible position, which was that it is not required to change from the Rule of 78's to the economic accrual method, and in so doing deemed it unnecessary to comply either with the requirements of Rev.Proc. 84–28 or file a protective application in the face of the rule that deductions are a matter of grace and not of right, *supra.* This being true, Quincy cannot later alter the intentional consequences of its actions, given that its earlier position was incorrect. We have held, *supra,* that Quincy's income was not clearly reflected, *as reported* under the Rule of 78's, and Quincy must, therefore, change to the economic accrual method in allocating its interest expenses, a method which, *in the opinion of the Commissioner/Secretary,* clearly reflects its income. In so doing, however, on this record, Quincy is not entitled to the benefits of Rev.Proc. 84–28, because it failed to comply with the revenue procedure's obligatory provision(s), *i.e.,* Quincy failed to file Form 3115.

With regard to Quincy's second contention, we find Quincy's argument, that it may be subject to duplicative litigation, given that, if it had won in this court, it would have to reapply to change its method back to the Rule of 78's, which could then be subsequently denied by the Commissioner, to be clearly ludicrous. Obviously, if we were to find, which we do not, that Quincy's income was clearly reflected by the use of the Rule of 78's method, then under § 446(b) of the Code, the Commissioner would, of course, not have the authority to change Quincy's method to the economic

---

plication for Change in Accounting method, in duplicate.
(emphasis in original and added). Said section *also provides* that:
[A]t the time the original of the Form 3115 is filed with the federal income tax return, a

copy of the Form 3115 *shall be filed* with the National Office addressed to the Commissioner of Internal Revenue Service....
(emphasis added).

accrual method, *ab initio. Morgan Guaranty Trust,* 218 Ct.Cl. at 71, 585 F.2d 988. In such circumstances, we would find an abuse of discretion by the Commissioner, and the status quo would then obtain. Thus, it is clear beyond cavil that once this court found that the Commissioner had no authority under § 446(b) to change Quincy's method, the Commissioner could not then withhold his permission to allow Quincy to reverse a "protective application" for change back to the Rule of 78's, the method by which the court determined Quincy's income was clearly reflected. Based on all of the foregoing, we, therefore, find that Quincy is not entitled to use Rev.Proc. 84–28 in changing its method of accounting for interest deductions from the Rule of 78's to the economic accrual method.

## CONCLUSION

Given the foregoing, we are compelled to hold that, with respect to Count I, the Commissioner did not abuse his discretion in determining that Quincy's income for each of the taxable years in issue was not clearly reflected in view of its method of accounting, because Quincy's use of the Rule of 78's distorted its interest expense deductions in such a manner as to bunch-up a substantially excessive amount of interest expense in the earlier years of the loan, and left a disproportionately small amount of interest to be allocated to the latter years of the loan. In addition, we find that the Commissioner properly changed Quincy's method of allocating interest expense deductions from the Rule of 78's method to the economic accrual method, in that said method was reasonable and, in the opinion of the Commissioner, clearly reflected Quincy's income. Case law is legion in that in such circumstances the Commissioner's "... interpretation of the statute's clear-reflection standard should not be interfered with unless clearly unlawful." *Thor Power Tool,* 439 U.S. at 532, 99 S.Ct. at 780 (citations omitted). On this record, we do not find it to be "clearly unlawful." *Id.* Having so found, *supra,* we accordingly find that the taxpayers' interest expense deductions in each year do not clearly reflect income and the Commissioner did not

abuse his discretion by changing to a method of accounting that, in his opinion, clearly reflects income.

Finally, with respect to Count III, we find that Quincy is not entitled to the benefits of Rev.Proc. 84–28 because it failed to file Form 3115, Application for Change in Accounting Method, as required by the revenue procedure. In such case, plaintiffs, the limited partners, are, therefore, not entitled to the benefits thereof.

The Clerk shall, therefore, enter judgment in favor of defendant and against the plaintiffs, dismissing subject complaint. Costs to the defendant.

IT IS SO ORDERED.

*Part B:*

## RELATED CASES

### A. *Brief Overview:*

The above-captioned case, *Mulholland v. United States,* 16 Cl.Ct. 252, is one of sixty-eight (68) related cases (Related Cases), involving 27 separate partnerships, raising similar issues of fact and law, in that each of the 68 related cases, including *Mulholland,* involve the Commissioner of Internal Revenue's disallowance of a particular partnership's use of the Rule of 78's method of accounting in allocating deductible interest expenses for federal income tax purposes in each of the taxable years at issue. More specifically, each of the Related Cases' complaints contains the following three counts, as similarly contained in *Mulholland:*

*Count I:* The Commissioner abused his discretion in determining that the respective partnerships were not entitled to deduct interest expenses, allocated pursuant to the Rule of 78's method of accounting, to the extent that such method resulted in a claimed interest expense (which did not clearly reflect income) in excess of the amount otherwise accruable under the economic accrual method;

*Count II:* The Commissioner abused his discretion under 26 U.S.C. § 7805(b): (a) in

failing to apply the rationale [54] of Rev.Rul. 83–84 on a prospective only basis; and (b) in exempting short-term consumer loans from its mandates; and

*Count III:* The Commissioner erred in refusing to allow the respective partnerships the opportunity to utilize the beneficial procedures outlined in Rev.Proc. 84–28.

The following table provides a complete and detailed list of all of the twenty-seven (27) partnerships and sixty-seven (67) Related Cases, which are presently pending before this court and are the subject matter of this opinion:

| RELATED CASES [55] | COUNTS | FILED | TAX YEARS |
|---|---|---|---|
| 1) WILKES PARTNERSHIP | | | |
| Wilkes Partners v. U.S., # 91–1234T | 3 | 6/20/91 | 1983–1987 |
| Wilkes Partners v. U.S., # 92–420T | 3 | 6/19/92 | 1988–1989 |
| 2) TYLER PARTNERSHIP | | | |
| Tyler Partners v. U.S., # 91–1236T | 3 | 6/20/91 | 1983–1987 |
| Tyler Partners v. U.S., # 92–782T | 3 | 11/12/92 | 1988 |
| 3) BILOXI PARTNERSHIP | | | |
| Biloxi Partners v. U.S., # 91–1244T | 3 | 6/24/91 | 1983–1987 |
| Biloxi Partners v. U.S., # 92–474T | 3 | 7/10/92 | 1988–1989 |
| 4) COLLEGE STATION PARTNERSHIP | | | |
| College Station Partners v. U.S., # 91–1253T | 3 | 7/1/91 | 1983–1987 |
| College Station Partners v. U.S., # 92–448T | 3 | 7/1/92 | 1988–1989 |
| 5) QUINCY PARTNERSHIP | | | |
| Quincy Associates v. U.S., # 91–1279T | 3 | 7/12/91 | 1983–1987 |
| Quincy Associates v. U.S., # 92–467T | 3 | 7/10/92 | 1988–1989 |
| Servison v. U.S., # 92–742T | 3 | 10/26/92 | 1981 |
| Phillips v. U.S., # 92–743T | 3 | 10/26/92 | 1982 |
| 6) ST. TAMMANY PARTNERSHIP | | | |
| St. Tammany Partners v. U.S., # 91–1293T | 3 | 7/18/91 | 1983–1987 |
| St. Tammany Partners v. U.S., # 92–320T | 3 | 5/21/92 | 1988–1989 |
| St. Tammany Partners v. U.S., # 92–772T | 3 | 11/6/92 | 1989 |
| 7) NORTHRIDGE PARTNERSHIP | | | |
| Northridge Partners v. U.S., # 91–1294T | 3 | 7/18/91 | 1983–1987 |
| Northridge Partners v. U.S., # 92–449T | 3 | 7/1/92 | 1988–1989 |
| Ford v. U.S., # 92–556T | 3 | 8/14/92 | 1982 |
| 8) MANCHESTER PARTNERSHIP | | | |
| Manchester Partners v. U.S., # 91–1295T | 3 | 7/18/91 | 1987 |
| Manchester Partners v. U.S., # 92–445T | 3 | 7/1/92 | 1988–1989 |
| 9) CC PARTNERSHIP | | | |
| Rombach v. U.S.,[56] # 90–30T | 3 | 1/9/90 | 1981–1982 |
| CC Partners v. U.S., # 91–1300T | 3 | 7/19/91 | 1983–1987 |
| CC Partners v. U.S., # 92–446T | 3 | 7/1/92 | 1988–1989 |

**54.** Recall that, pursuant to the rationale under Rev.Rul. 83–84, a taxpayer is not permitted to deduct interest expenses, pursuant to the Rule of 78's, to the extent that said deduction exceeds the amount otherwise allowable under the economic accrual method, inasmuch as said excess deduction is deemed not to clearly reflect the taxpayer's income. See Rev.Rul. 83–84.

**55.** In each of the related cases, except for one, counsel for the plaintiffs is Richard M. Squire of Cohen, Shapiro, Polisher, Sheikman and Cohen in Philadelphia, Pennsylvania, and counsel for the defendant is William K. Drew of the Department of Justice in Washington, D.C. In the one remaining case, *i.e., Rombach v. United States,* Fed.Cl. No. 90–30T, counsel for the plaintiffs is Louis H. Rombach, Esq. of Wilmington, Delaware, and counsel for the defendant is Arthur C. Hoene of the Department of Justice in Washington, D.C.

**56.** The *Rombach* case also relates to the Shelby Partnership as well. In addition, the plaintiffs in *Rombach* are before this court as *pro se* litigants.

| RELATED CASES | COUNTS | FILED | TAX YEARS |
|---|---|---|---|
| Kojabashian v. U.S., # 93–6T | 3 | 1/8/93 | 1981–1982 |
| 10) ACADIA PARTNERSHIP | | | |
| Acadia Partners v. U.S., # 91–1322T | 3 | 7/29/91 | 1983–1987 |
| Acadia Partners v. U.S., # 92–323T | 3 | 5/1/92 | 1988–1989 |
| Acadia Partners v. U.S., # 92–773T | 3 | 11/6/92 | 1989 |
| 11) OCEAN SPRINGS PARTNERSHIP | | | |
| Ocean Springs Partners v. U.S., # 91–1323T | 3 | 7/29/91 | 1983–1987 |
| Ocean Springs Partners v. U.S., # 92–435T | 3 | 6/26/92 | 1988–1989 |
| 12) SHELBY PARTNERSHIP | | | |
| Shelby Partners v. U.S., # 91–1324T | 3 | 7/29/91 | 1983–1987 |
| Shelby Partners v. U.S., # 92–418T | 3 | 6/19/92 | 1988–1989 |
| Glickman v. U.S., # 92–538T | 3 | 8/7/92 | 1981 |
| 13) ST. LANDRY PARTNERSHIP | | | |
| St. Landry v. U.S., # 91–1386T | 3 | 8/23/91 | 1983–1987 |
| Murphy v. U.S., # 92–348T | 3 | 5/15/92 | 1981–1982 |
| St. Landry v. U.S., # 92–419T | 3 | 6/19/92 | 1988–1989 |
| 14) CLEAR POINTE PARTNERSHIP | | | |
| Clear Pointe Partners v. U.S., # 91–1396T | 3 | 8/30/91 | 1983–1986 |
| Clear Pointe Partners v. U.S., # 92–35T | 3 | 1/16/92 | 1987 |
| Clear Pointe Partners v. U.S., # 92–473T | 3 | 7/10/92 | 1988–1989 |
| 15) MITCHELL PARTNERSHIP | | | |
| Fortney v. U.S., # 91–1411T | 3 | 9/6/91 | 1981–1982 |
| Mitchell Partners v. U.S., # 91–1471T | 3 | 9/26/91 | 1983–1987 |
| Mitchell Partners v. U.S., # 92–447T | 3 | 7/1/92 | 1988–1989 |
| 16) SLIDELL PARTNERSHIP [57] | | | |
| 17) MARION COUNTY PARTNERSHIP | | | |
| Marion County Partners v. U.S., # 91–1450T | 3 | 9/20/91 | 1983–1986 |
| Marion County Partners v. U.S., # 92–33T | 3 | 1/16/92 | 1987 |
| Marion County Partners v. U.S., # 92–417T | 3 | 6/19/92 | 1988–1989 |
| 18) SOUTHERN PARTNERSHIP | | | |
| Southern Partners v. U.S., # 91–1451T | 3 | 9/20/91 | 1983–1986 |
| Southern Partners v. U.S., # 992–34T | 3 | 1/16/92 | 1987 |
| Southern Partners v. U.S., # 92–412T | 3 | 6/19/92 | 1988–1989 |
| 19) TRIANGLE SQUARE PARTNERSHIP | | | |
| Triangle Partners v. U.S., # 92–143T | 3 | 3/2/92 | 1983–1987 |
| Triangle Partners v. U.S., # 92–416T | 3 | 6/19/92 | 1988–1989 |
| 20) WAVELAND PARTNERSHIP | | | |
| Waveland Partners v. U.S., # 92–144T | 3 | 3/2/92 | 1983–1987 |
| Waveland Partners v. U.S., # 92–415T | 3 | 6/19/92 | 1988–1989 |
| 21) LAKELAND PARTNERSHIP | | | |
| Lakeland Partners v. U.S., # 92–145T | 3 | 3/2/92 | 1983–1987 |
| Lakeland Partners v. U.S., # 92–319T | 3 | 5/1/92 | 1988–1989 |
| Lakeland Partners v. U.S., # 92–780T | 3 | 11/12/92 | 1989 |
| 22) ST. JOHN PARTNERSHIP | | | |
| St. John Partners v. U.S., # 92–146T | 3 | 3/2/92 | 1983–1987 |
| St. John Partners v. U.S., # 92–414T | 3 | 6/19/92 | 1988–1989 |
| 23) MOBILE PARTNERSHIP | | | |
| Mobile Partners v. U.S., # 92–147T | 3 | 3/2/92 | 1983–1987 |
| Mobile Partners v. U.S., # 92–413T | 3 | 6/19/92 | 1988–1989 |
| 24) DLG PARTNERSHIP | | | |
| DLG Partners v. U.S., # 92–148T | 3 | 5/1/92 | 1983–1987 |
| DLG Partners v. U.S., # 92–500T | 3 | 7/27/92 | 1988–1989 |

**57.** The aforementioned case of *Fortney v. United States*, Fed.Cl. No. 91–1411, includes the Slidell Partnership in addition to the Mitchell partnership. No other case involves Slidell Partners and, therefore, no separate *Slidell* proceeding exists.

| RELATED CASES | COUNTS | FILED | TAX YEARS |
|---|---|---|---|
| 25) PRINCETON PARTNERSHIP | | | |
| Princeton Partners v. U.S., # 92–149T | 3 | 3/2/92 | 1983–1987 |
| Princeton Partners v. U.S., # 92–450T | 3 | 7/1/92 | 1988 |
| Wright v. U.S., # 92–650T | 3 | 9/18/92 | 1982 |
| 26) FRANKLIN PARTNERSHIP | | | |
| Franklin Partners v. U.S., # 92–150T | 3 | 5/1/92 | 1983–1987 |
| Franklin Partners v. U.S., # 92–499T | 3 | 7/27/92 | 1988–1989 |
| 27) BATON ROUGE PARTNERSHIP | | | |
| Baton Rouge Partners v. U.S., # 92–317T | 3 | 5/1/92 | 1988–1989 |
| Baton Rouge Partners v. U.S., # 92–781T | 3 | 11/12/92 | 1989 |

---

### B. *Joint Motion and Stipulations:*

On March 5, 1993, the parties filed a motion to consolidate the aforementioned Related Cases with the above-captioned case, *Mulholland v. United States*, 16 Cl. Ct. 252. Said motion was allowed on March 25, 1993.[58] In addition to the joint motion for consolidation, the parties also filed a joint stipulation on March 5, 1993, with regard to the Related Cases, and later a supplemental stipulation thereto on April 6, 1993. The March 5, 1993 "Joint Motion And Stipulation" provides, in full as follows: [59]

The parties hereby stipulate, for purposes of the proceedings identified in the list attached hereto (Related Cases), as follows:

1. The record for the Court's decision in the Related Cases shall consist of (a) the trial record in the above-captioned case, [*Mulholland v. United States*, 16 Cl.Ct. 252], including all documentary and testimonial evidence admitted at trial; (b) the additional exhibits submitted herewith; and (c) the pleadings, motions, briefs, and memoranda (and exhibits with respect thereto) filed in the Related Cases.

2. Except to the extent that the parties have stipulated or admitted any facts in the above-captioned case, the parties, by this stipulation of the record, do not admit to the truth of any alleged facts, but are stipulating to the record upon which the Court may make its findings of fact.

3. The parties stipulate that the material facts with respect to the transactions in issue in the Related Cases are substantially identical to the material facts in the above-captioned case. The additional exhibits attached hereto set forth the essential terms of the transactions in issue in the Related Cases and set forth matters with respect to jurisdictional requirements in the Related Cases.

4. The parties' contentions of fact and law with respect to the Related Cases are as set forth in their submissions in the above-captioned case and in the pleadings and motions filed in the Related Cases.

5. In light of this stipulation and the parties' joint motion to consolidate the Related Cases with the above-captioned case, the parties contemplate that the Court will issue a single decision disposing of the above-captioned case and the Related Cases. [c/o *United States v. Dickinson*, 331 U.S. 745, 746, 67 S.Ct. 1382, 1383, 91 L.Ed. 1789 (1947).] The parties stipulate that for purposes of appeal, this stipulation (and the exhibits attached thereto) and all exhibits, transcripts, briefs, and other documents included in the record on appeal in the above-captioned case shall be part of the

---

58. The case of *Louis H. Rombach and Ann M. Rombach,* Fed.Cl. No. 90–30T, was also consolidated with the aforementioned related cases on March 25, 1993, pursuant to a motion filed by Mr. Rombach on March 12, 1993.

59. The *Rombach* stipulation filed on March 12, 1993, by Mr. Louis Rombach, is worded almost identically to the joint stipulation filed in the other 67 related cases by counsel of record in those cases, Mr. Richard M. Squire and Mr. William K. Drew.

record on appeal for all of the Related Cases.

6. The parties stipulate to the dismissal, in part, of each of the Related Cases to the extent that the complaints in the Related Cases seek relief on the same ground as set forth in Count II of the above-captioned case, which has been dismissed. *Mulholland v. United States,* 16 Cl.Ct. 252 (1989); provided however, this dismissal, in part, shall in no way prejudice or limit the right of appeal with regard to Count II of the above-captioned case; nor shall it prejudice any appeal of the Related Cases to the extent they seek relief on the same grounds as set forth in Count II.

Following a telephonic conference on March 25, 1993, at which time the court directed the parties to expand or embellish their March 5, 1993 Joint Motion And Stipulation, the parties filed a Supplemental Stipulation on April 6, 1993, which provides in full as follows: [60]

### COUNT I

1. With respect to the cause of action in each of the Related Cases that corresponds to the cause of action set forth in Count I of the above-captioned case, the facts with respect to the partnerships in issue therein are not materially different from the facts with respect to Quincy Associates, Limited, in the above-captioned case.

2. All material facts to be found by the Court with respect to Count I in the above-captioned case are representative of the corresponding facts with respect to the cause of action in each of the Related Cases that corresponds to the cause of action in Count I of the above-captioned case.

3. The Court may explicitly make its conclusions of law and enter judgment with respect to the cause of action in each of the Related Cases that corre-

sponds to the cause of action in Count I of the above-captioned case based on its findings of fact with respect to Count I of the above-captioned case, which the parties expressly stipulate are representative of all material facts in the related cases.

4. The Court's findings of fact with respect to Count I of the above-captioned case shall constitute the Court's findings with respect to the cause of action in each of the Related Cases that corresponds to the cause of action set forth in Count I of the above-captioned case, and the parties expressly waive the making of findings of fact specially, as stated in RCFC 52,[61] with respect to the cause of action in each and every Related Case that corresponds to the cause of action in Count I of the above-captioned case.

5. The findings of fact to be made by the Court with respect to Count I of the above-captioned case shall serve, by express stipulation of the parties, as the Court's findings of fact, for all purposes, with respect to the cause of action in each and every Related Case that corresponds to Count I of the above-captioned case.

6. With respect to the merits of the cause of action in each of the Related Cases that corresponds to the cause of action in Count I of the above-captioned case, no facts exist that differ in any material way from the facts with respect to Count I in the above-captioned case and the disposition of the cause of action in each and every Related Case that corresponds to the cause of action in Count I of the above-captioned case based on the specific findings of fact to be made with respect to Count I of the above-captioned case will not prejudice any party to any degree as a matter of fact or law and will not prejudice any rights that could be asserted by any party to any proceedings.

---

60. Again, the *Rombach* supplemental stipulation, filed on April 5, 1993, is essentially identical to that of the other 67 related cases as filed by their representative counsel.

61. RCFC 52(a) provides, in pertinent part, as follows:
"In all actions tried upon the facts, the court shall find the facts specially and state separately its conclusions of law thereon...."

### Count III

7. With respect to the cause of action in the Related Cases that corresponds to the cause of action in Count III of the above-captioned case, the material facts are exactly the same as the material facts with respect to the cause of action in Count III of the above-captioned case.

8. The examination by the Internal Revenue Service, in which the Commissioner of Internal Revenue disallowed the use of the Rule of 78's, with respect to each of the partnerships involved in the Related Cases, was done with respect to all partnerships simultaneously and the evidence presented by the parties with respect to Count III of the above-captioned case is the exact evidence that they would present with respect to the cause of action in each of the Related Cases that corresponds to the cause of action in Count III of the above-captioned case, if tried separately.

9. The Court's findings of fact with respect to Count III of the above-captioned case may be made as the findings of fact with respect to the cause of action in each and every Related Case that corresponds to the cause of action in Count III of the above-captioned case, inasmuch as the material facts with respect to the cause of action in each of the Related Cases that corresponds to the cause of action in Count III of the above-captioned case are identical facts as exist with respect to Count III of the above-captioned case.

Consistent with the foregoing inclusive stipulations, and the sixty-seven (67) Related Cases' complaints, the court shall next address in the aggregate Counts I, II and III, seriatim.

### C. *Count I:*

 As previously observed, there are two substantive questions on the merits before this court with respect to Count I, the first being—whether each and every partnership's income, in the Related Cases, is "clearly reflected" notwithstanding its use of the Rule of 78's in allocating its interest expense deductions in the taxable years at issue; and secondly, whether the Commissioner abused his discretion in determining that the respective partnerships in the Related Cases were not entitled to deduct interest expenses, pursuant to the Rule of 78's method, in excess of that allowable under the economic accrual method. With respect to these issues under Count I, the parties have emphatically and *expressly stipulated* that the material facts regarding the partnerships in the Related Cases "are not materially different from the facts with respect to the Quincy Associates, Limited" partnership. Indeed, the parties have even seen fit to memorialize the operative facts and circumstances by stipulating that (i) all of the Related Cases shall be consolidated with the captioned case and that the court will issue a single decision disposing of *Mulholland* and all said Related Cases; (ii) with respect to the material facts in Count I of the above-captioned case, said facts "are representative of the corresponding facts" in the Related Cases and are not materially different; (iii) "[t]he Court may explicitly make its conclusions of law and enter judgment ... in the Related Cases ... based on its findings of fact with respect to Count I of the above-captioned case ..."; (iv) "[t]he findings of fact ... made by the Court with respect to Count I of the above-captioned case shall serve ... as the Court's findings of fact, for all purposes, with respect to ... each and every Related Case that corresponds to Count I of the above-captioned case, in that, "the parties [have] expressly waive[d] the making of findings of fact specially [by the Court], as stated in RCFC 52"; and (v) "with respect to the merits of the cause of action [in Count I] in each of the Related Cases ... *no facts exist that differ in any material way from the facts with respect to Count I in the above-captioned case....*" Given all of the foregoing, we hold that there is now no need for the court to make separate and distinct RCFC 52 findings of fact, relating to Count I issues, as to each and every Related Case in order to determine whether its respective partnership income is clearly reflected by its use of the Rule of

78's method of allocating deductible interest expenses for each year. Obviously, in view of the manner in which the parties have explicitly stipulated to the binding effect of the court's findings of fact in the above-captioned case, the parties, and the court, are clear as to the point, and we so hold, that any variances in the operative facts between the captioned case and the Related Cases are distinctions without significant differences. That is, the results with respect to the partnerships in the Related Cases and that of the Quincy partnership, in utilizing the Rule of 78's in allocating interest, are substantially the same in that the interest expense deductions taken each year by the partnerships in the Related Cases are substantially bunched up in the earlier years of the loan, leaving a relatively small amount of interest to be deducted in the latter years of the loan. Clearly, the mere difference in amounts of the respective partnerships' deductions is insignificant in comparison to those taken by Quincy, particularly in light of this court's ruling, *supra*. This being true, then, if the court were to make RCFC 52 findings respecting each of the amortization schedules of the partnerships herein, and compare them with that of Quincy's in Appendix A, we would be constrained to find that the essential result in the Related Cases would be substantially the same as in the captioned case, *i.e.,* a material distortion of the partnership's income in the taxable years at issue. Against this background, therefore, we are compelled to conclude that as to each and every partnership involved as a Related Case, the partnership's use of the Rule of 78's in allocating deductible interest expenses does not clearly reflect the partnership's income for the taxable year(s) at issue. Accordingly, and based on our analysis, *supra,* and the parties' judicial stipulation(s)—that all of the material facts with respect to Count I in the Related Cases are substantially similar to those in the captioned case—we find that the Commissioner *did not* abuse his discretion in determining that the respective partnerships' (Related Cases) income was not clearly reflected by the use of the Rule of 78's method in allocating deductible interest expenses—to the extent that such method resulted in excess deductions beyond that of the amounts allowable under the economic accrual method. We also hold, based on our analysis, *supra,* that the Commissioner did not abuse his discretion in changing the respective partnerships' method of accounting for interest deductions from the Rule of 78's to the economic accrual method, in that the Commissioner's use of the economic accrual method in determining the correct amount of interest expense allowable for each and every partnership involved in the Related Cases was reasonable, particularly in light of the wide latitude given to the Commissioner by Congress in § 446(b) of the Code. *Thor Power Tool,* 439 U.S. at 532, 99 S.Ct. at 780 (citations omitted).

As a result of our holding herein, the plaintiffs in each of the 67 Related Cases argue, alternatively, that to the extent that the court finds the Commissioner's determination to be correct, they are entitled to receive the benefits of Rev.Proc. 84–28. We shall, therefore, address said contention, Count III, *infra,* as it relates to the partnerships in the Related Cases.

D. *Count II:*

As referenced in paragraph 6 of the Joint Stipulation filed on March 5, 1993, the parties have stipulated to the dismissal of Count II, "to the extent that the complaints in the Related Cases seek relief on the same ground as set forth in Count II of the above-captioned case." After a careful review of each of the 67 Related Cases, we find that with regard to the cause of action set forth in Count II therein, each of the Related Cases seeks the same relief on the same ground(s) as that set forth in Count II of the captioned complaint. This being true, then we find that with respect to all of the sixty-seven (67) Related Cases, the

cause of action relating to Count II is hereby dismissed consistent with the parties' foregoing stipulation(s).

### E. *Count III:*

Inasmuch as the parties have specifically stipulated that with respect to Count III, "the material facts [in Count III of *Mulholland*] are *exactly* the same as the material facts" in Count III of the corresponding Related Cases, the court, of course, need not make specific findings of fact with respect to Count III in the sixty-seven (67) Related Cases, as they have been deemed to be one and the same as those in the captioned case. Therefore, in light of the parties' stipulation that [i] "the examination by the Internal Revenue Service, in which the Commissioner of Internal Revenue disallowed the use of the Rule of 78's, with respect to each of the partnerships involved in the Related Cases, was done with respect to *all* partnerships *simultaneously*, and [ii] the evidence presented by the parties with respect to Count III of above-captioned case is the *exact* evidence that they would present with respect to the cause of action in each of the Related Cases that corresponds to the cause of action in Count III of the above-captioned case, if tried separately," it is clear beyond cavil that each of the partnerships in the Related Cases are not entitled to the benefits of Rev.Proc. 84–28, in that they also have failed to comply with the mandatory procedures of the revenue procedure by failing to file Form 3115, as required.[62] We are, therefore, constrained to hold that the twenty-seven (27) partnerships involved in the sixty-seven (67) Related Cases must comply with the procedures delineated in § 481 of the Internal Revenue Code when changing from the Rule of 78's method of accounting to the economic accrual method of accounting without obtaining the beneficial income spread of Rev.Proc. 84–28. *See* the captioned case analysis, *supra,* in Count III of this opinion.

### CONCLUSION [63]

Given all of the foregoing, we are compelled to hold that, with respect to Count I, the Commissioner did not abuse his discretion in determining that each and every partnership's income in the Related Cases, for the taxable year(s) in issue, was not clearly reflected, because the respective partnership's method of accounting in using the Rule of 78's distorted its interest expense deductions in such a manner as to bunch up a substantially excessive amount of interest expense in the earlier years of the loan, and left a disproportionately minimal amount of interest to be allocated to the later years of the loan. In addition, we find that the Commissioner properly changed each and every partnership's method of allocating interest expense deductions from the Rule of 78's method to the economic accrual method in that said method, as applied, was reasonable and, in the opinion of the Commissioner, clearly reflected the respective partnership's income. Having found such, *supra,* we accordingly find that each of the related taxpayer's interest expense deduction, in each year, does not clearly reflect income and the Commissioner did not abuse his discretion by changing to a method of accounting that, in his opinion, clearly reflects income.

Finally, with respect to Count III, we find that each and every partnership involved in the Related Cases is not entitled to the benefits of Rev.Proc. 84–28, because it failed to file Form 3115, Application for Change in Accounting Method, as required by the revenue procedure. In such case,

---

**62.** Note that the court also deems its findings—whether an issue was "raised and pending" on April 2, 1984, with respect to Quincy's interest expense deductions, allocated pursuant to the Rule of 78's method of accounting, to be applicable to each and every partnership involved in the Related Cases. That is, an issue with respect to the Rule of 78's interest expense deductions taken by each of the partnerships involved in the Related Cases, was *not* "raised and pending" on April 2, 1984, as contended by the defendant. Thus, if the partnerships had complied with the

mandatory procedures of Rev.Proc. 84–28, they would have been entitled to the benefits provided for therein.

**63.** The analysis and rationale implicit in Counts I and III, *supra,* in the captioned case are adopted and applied, *in haec verba,* as the analysis and legal rationale in the corresponding Count I and Count III in all of the Related Cases.

all plaintiffs in the related cases herein are, therefore, not entitled to the benefits thereof.

The Clerk shall, therefore, enter judgment in favor of defendant and against all related plaintiffs, dismissing the complaints in all of the sixty-seven (67) Related Cases. Costs to the defendant against all related plaintiffs.

IT IS SO ORDERED.

APPENDIX A

| Year | Rule of 78's Accrual | Portion of Annual Payments Allocated to Interest Under the Rule of 78's | Ratable Accrual of Interest | Economic Accrual of Interest | Difference Between Rule of 78's Tax Accrual and Economic Accrual of Interest |
|---|---|---|---|---|---|
| 1980 | $ 71,402 | $ 71,402 | $ 35,893 | $ 43,964 | $. 27,438 |
| 1981 | 417,604 | 385,000 | 215,363 | 249,847 ✓ | 167,757 |
| 1982 | 399,078 | 379,000 | 215,363 | 233,415 | 165,663 |
| 1983 | 380,552 | 362,000 | 215,363 | 216,349 | 164,203 |
| 1984 | 362,026 | 206,000 | 215,363 | 207,659 | 154,367 |
| 1985 | 343,500 | 206,000 | 215,363 | 207,866 [1] | 135,634 |
| 1986 | 324,976 | 206,000 | 215,363 | 208,098 | 116,878 |
| 1987 | 306,448 | 206,000 | 215,363 | 208,358 | 98,090 |
| 1988 | 287,924 | 206,000 | 215,363 | 208,651 | 79,273 |
| 1989 | 269,396 | 206,000 | 215,363 | 208,981 | 60,415 |
| 1990 | 250,872 | 206,000 | 215,363 | 209,351 | 41,521 |
| 1991 | 232,345 | 206,000 | 215,363 | 209,768 | 22,577 |
| 1992 | 213,820 | 206,000 | 215,363 | 210,236 | 3,584 |
| 1993 | 195,293 | 206,000 | 215,363 | 210,763 | (15,470 ) |
| 1994 | 176,768 | 206,000 | 215,363 | 211,354 | (34,586 ) |
| 1995 | 158,241 | 206,000 | 215,363 | 212,020 | (53,779 ) |
| 1996 | 139,716 | 206,000 | 215,363 | 212,768 | (73,052 ) |
| 1997 | 121,190 | 206,000 | 215,363 | 213,609 | (92,419 ) |
| 1998 | 102,664 | 206,000 | 215,363 | 214,555 | (111,891 ) |
| 1999 | 84,139 | 206,000 | 215,363 | 215,618 ✓ | (131,479 ) |
| 2000 | 65,612 | 206,000 | 215,363 | 216,813 | (151,201 ) |
| 2001 | 47,087 | 206,000 | 215,363 | 218,156 | (171,069 ) |
| 2002 | 28,560 | 73,811 | 215,363 | 219,667 | (191,107 ) |
| 2003 | 10,036 | 10,363 | 215,363 | 221,366 | (211,330 ) |
| TOTAL | $4,989,249 | $4,989,249 | $4,989,249 [2] | $4,989,249 [2] | –0–[2] |

[1] In years 1985 through 2003, interest accruals under the economic-accrual method increase from year to year due to the negative amortization of interest that also occurs under this method.

[2] Amounts less than a dollar have been dropped. Accordingly, arithmetic addition for the figures set forth in these columns will not exactly equal the total for the columns.

## APPENDIX B
### Table 4
Interest Rates Associated with the Project
and Interest Rate Approximations Based
on the Quincy and Constant Interest Rate Methods

| | Economic Rate | | Quincy | | Constant Interest Rate | |
|---|---|---|---|---|---|---|
| | Yield to Date | 1 Period Rates | Yield to Date | 1 Period Rates | Yield to Date | 1 Period Rates |
| 1 | 18.81% | 18.81% | 18.80% * | 18.80% * | 11.77% | 11.77% |
| 2 | 18.35% | 17.90% | 18.26% * | 17.71% * | 11.77% | 11.77% |
| 3 | 17.93% | 17.09% | 17.75% * | 16.74% * | 11.77% | 11.77% |
| 4 | 17.45% | 16.00% | 17.15% * | 15.34% * | 11.77% | 11.77% |
| 5 | 16.90% | 14.72% | 16.46% * | 13.70% * | 11.77% | 11.77% |
| 6 | 16.36% | 13.66% | 15.77% * | 12.32% * | 11.77% | 11.77% |
| 7 | 15.85% | 12.80% | 15.11% * | 11.15% | 11.77% | 11.77% * |
| 8 | 15.38% | 12.09% | 14.49% * | 10.14% | 11.77% | 11.77% * |
| 9 | 14.95% | 11.50% | 13.91% * | 9.25% | 11.77% | 11.77% * |
| 10 | 14.56% | 11.01% | 13.36% * | 8.45% | 11.77% | 11.77% * |
| 11 | 14.20% | 10.60% | 12.85% * | 7.73% | 11.77% | 11.77% * |
| 12 | 13.87% | 10.27% | 12.37% * | 7.07% | 11.77% | 11.77% * |
| 13 | 13.57% | 10.00% | 11.91% * | 6.46% | 11.77% | 11.77% * |
| 14 | 13.30% | 9.78% | 11.48% | 5.89% | 11.77% * | 11.77% * |
| 15 | 13.06% | 9.61% | 11.07% | 5.34% | 11.77% * | 11.77% * |
| 16 | 12.83% | 9.47% | 10.68% | 4.80% | 11.77% * | 11.77% * |
| 17 | 12.63% | 9.38% | 10.30% | 4.27% | 11.77% * | 11.77% * |
| 18 | 12.44% | 9.32% | 9.94% | 3.74% | 11.77% * | 11.77% * |
| 19 | 12.28% | 9.29% | 9.58% | 3.20% | 11.77% * | 11.77% * |
| 20 | 12.13% | 9.29% | 9.24% | 2.62% | 11.77% * | 11.77% * |
| 21 | 12.00% | 9.32% | 8.89% | 2.00% | 11.77% * | 11.77% * |
| 22 | 11.88% | 9.37% | 8.55% | 1.30% | 11.77% * | 11.77% * |
| 23 | 11.77% | 9.44% | 8.20% | 0.50% | 11.77% * | 11.77% * |

Notes: Year 1 is 14 months long to simplify the analysis. That interest rate has been adjusted to an annual basis.

The economic yield to any point in time from the start of the project has been determined by calculating the required cash flows to that point if the project is terminated. This is appropriate here due to the unilateral ability to terminate and the associated "locked in" cash flows earned to that point. The one period economic return is that interest rate that must prevail based on the economic theory of interest rates.

The Quincy method one period rate for any year is the average of the monthly interest expenses divided by the mortgage balance outstanding for that month. The Quincy method yield to any point in the project is the weighted average of the one period rates.

The constant interest rate method yield is a mathematical solution to a 23 period problem simplified by assuming there is no risk of premature termination and assuming all 23 periods and associated interest rates are identical.